892 A.2d 1164

Walter L. BENNETT, IV

v.

Melanie WRIGHT.

No. 128, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Feb. 24, 2006.

Cynthia E. Young, Annapolis, for appellant.

Jeffrey House, Washington, DC, for appellee.

Panel KRAUSER, SHARER and LAWRENCE F. RODOWSKY, (Retired, Specially Assigned) JJ.

SHARER, J.

Following his divorce from appellee, Melanie Wright, appellant, Walter L. Bennett, IV, brought an action in the Circuit Court for Anne Arundel County to enforce a provision of their property settlement agreement that he argues compels appellee to assign her interest in a split-dollar endorsement to an insurance policy. The circuit court denied the relief sought, and entered judgment in favor of appellee.

Appellant raises one issue on appeal:

Where Hartley Marine, Inc. was the owner of a split-dollar insurance policy and Appellee Wright was a sub-owner, is Wright required to convey her interest to Hartley pursuant to an agreement requiring that she "not claim any interest in or to the assets, income (past or future), property or goodwill" of Hartley Marine, Inc.?

For the reasons discussed, we answer in the negative and shall affirm the circuit court's judgment.

## FACTUAL and PROCEDURAL BACKGROUND

On October 15, 2002, appellant filed a petition in the circuit court seeking to enforce the terms of a judgment of divorce, into which the parties' property settlement agreement ("separation agreement" or "agreement") was incorporated, but not merged, and requesting relief in the form of a declaratory judgment. Specifically, appellant sought assignment, by appellee, of her "sub-ownership" interest in a split-dollar endorsement ("split-dollar endorsement" or "endorsement") to a life insurance policy to the "owner" of that policy, Hartley Marine, Inc. ("HMI"). A trial was held on February 25, 2004, and the court issued an order and declaratory judgment denying appellant's request on March 8, 2004. Appellant noted this timely appeal on April 1, 2004.

### The Policy

At trial, the following facts were developed. Prior to their divorce, the parties, as husband and wife, each owned 50 percent of HMI. In 1985, they agreed to purchase a life insurance policy from Connecticut Mutual Life Insurance Company (now Mass Mutual) to insure appellee's life (Connecticut/Mass Mutual Policy # 200–70584590 ("policy")). On August 13, 1985, an application for the policy was made that included a split-dollar endorsement mechanism. In that endorsement, the parties were originally designated as follows: HMI was the owner; appellant, personally and not as agent for HMI, was the sub-owner; and appellee was the insured.

In 1998, despite marital difficulties, the parties continued to cooperate in their business matters, including the overall operation of HMI. In March 1998, appellant asked appellee to co-sign for the refinancing of HMI's debt. As consideration for this request, which appellee honored, appellant assigned his sub-owner rights in the split-dollar endorsement to the policy to appellee. Subsequent to the assignment, appellee exercised her right as sub-owner and changed the beneficiary of the policy to Zachary Bennett, the parties' minor son, on July 22, 2002.

### The Separation Agreement

The separation agreement at issue between the parties was entered into on February 1, 2001. This agreement was incorporated, but not merged, into the judgment of divorce, which was enrolled on October 11, 2001.[1] Pursuant to the agreement, appellant became the sole owner of HMI. Paragraph 18 of the agreement provided for the transfer of appellee's interest in HMI to appellant. In pertinent part, paragraph 18 stated:

> Execution of this Agreement shall be deemed a resignation of the Wife's roles as officer and director of HMI. From and after the date of this Agreement, the Wife shall not claim any interest in or to the assets, income (past or future), property, or goodwill of the said HMI.

The agreement did not itemize the assets of HMI, but did itemize the respective assets of the parties. With regard to life insurance, the agreement only referred to ownership of one life insurance policy, Sun Life of Canada Policy No. 9247430 ("Sun Life Policy"). Ownership of the Sun Life Policy was transferred from appellant to appellee pursuant to paragraph 45 of the agreement.[2] The agreement made no mention of the policy presently at issue.

As we shall discuss, *infra*, an unexecuted draft version of the agreement made a similar reference to the transfer of not one, but four, life insurance policies, including the Sun Life Policy, and the policy at issue in this case.[3]

---

1. Md.Code Ann., Fam. Law § 8–105(a)(2) provides:

 The court may enforce by power of contempt or as an independent contract not superseded by the divorce decree the provisions of a deed, agreement, or settlement that contains language that the deed, agreement, or settlement is incorporated but not merged into a divorce decree.

2. Paragraph 45 of the Agreement stated, in part:

 *Sun Life of Canada Policy 9247430.* The Husband is the owner of this policy. The Husband shall transfer ownership of this policy to Wife within thirty (30) days of the execution of this Agreement. . . .

3. The draft agreement provided:

## DISCUSSION

### Standard of Review

Judge Hollander outlined the principles of contract construction applicable to separation agreements in *Young v. Anne Arundel*, 146 Md.App. 526, 585–86, 807 A.2d 651; *cert. denied*, 372 Md. 432, 813 A.2d 259 (2002):

The construction of a written contract is a question of law, subject to *de novo* review by an appellate court. As a fundamental principle of contract construction, we seek to ascertain and effectuate the intention of the contracting parties. Moreover, "the primary source for determining the intention of the parties is the language of the contract itself."

Contracts are interpreted "as a whole to determine the parties' intentions." Ordinarily, the terms of a contract are

---

LIFE INSURANCE

46. *Sun Life of Canada Policy 9247430L.* The Husband is the owner and insured on this policy which has a cash value. The Husband shall transfer ownership of this policy to the Wife, free and clear of any liens or encumbrances. The Wife shall own this policy as her sole and separate property free and clear of the Husband. The Wife shall be solely responsible for the premium payments on this policy from and after the date of this Agreement.

47. *Massachusetts Mutual Policy 7 434 460.* The Wife is the insured, and the owner of the policy is Hartley Marine, Inc. The Wife shall own this policy as her sole and separate property, free and clear of the Husband and/or of Hartley Marine, Inc. The Husband and Hartley Marine, Inc. shall transfer ownership of this policy to the Wife, free and clear of any liens or encumbrances. The Wife shall be solely responsible for the premium payments on this policy from and after the date of this Agreement.

48. *Connecticut/Mass Mutual Policy 200–70120920.* The Husband is the insured, and the owner of the policy. The Husband shall own this policy as his sole and separate property, free and clear of the Wife. The Husband shall be solely responsible for the premium payments on this policy from and after the date of this Agreement.

49. *Connecticut/Mass Mutual 200–70584590. The Wife is the insured, Hartley Marine is the owner. The Wife shall own this policy as her sole and separate property, free and clear of the Husband and/or of Hartley Marine, Inc. The Husband and Hartley Marine, Inc. shall transfer ownership of this policy to the Wife, free and clear of any liens or encumbrances. The Wife shall be solely responsible for the premium payments on this policy from and after the date of this Agreement.*

(Emphasis added)

construed consistent with their usual meaning, unless it is apparent that the parties ascribed a special or technical meaning to them.

In ascertaining the parties' intent, Maryland follows the objective law of contract interpretation. Thus, the court is required to "give effect to [the contract's] plain meaning," without regard to what the parties to the contract thought it meant or intended it to mean. Generally, " 'it must be presumed that the parties meant what they expressed.' " Therefore, the " 'true test of what is meant is ... what a reasonable person in the position of the parties would have thought' the contract meant." " 'If only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.' " In addition, "the parties to an agreement are deemed to have contracted with knowledge of existing law...."

When a contract is clear and unambiguous, " 'its construction is for the court to determine.' " Whether a contract is ambiguous is a question of law, which is subject to de novo review by an appellate court. Contractual language is considered ambiguous when the words in it are susceptible of more than one meaning to a reasonably prudent person. A contract is not ambiguous, however, merely because the parties to it do not agree as to its meaning.

(Internal citations omitted).

## The Circuit Court's Ruling

The trial court offered an expansive explanation of its ruling on the question now before this Court, noting that the agreement made no change to the parties' owner and sub-owner interests.[4]

---

4. Note: Appellee was the plaintiff and appellant was the defendant below. These caption designations were taken from initial divorce proceeding and are maintained in our reproduction of the trial court's opinion, contrary to our usual practice, for the reasons explained, *infra.*

[T]his court notes that the change of sub-ownership form served to transfer Defendant's [appellant's] rights as sub-owner individually to Plaintiff [appellee] individually. HMI was not involved in this transaction. There is no evidence of any later modification or reversion as to this transfer of sub-ownership rights.

Maryland law does not prevent shared ownership of personal property such as an insurance policy. While such combined ownership arrangements are unusual in the context of insurance policies, they are well-known in the context of real property. The sub-owner may be seen as analogous to a fee simple owner and the owner may be seen as analogous to the holder of an easement, a long-term lease or a life estate for the duration of the life of the insured.

Defendant [appellant] contends that the agreement provided for the insurance policy to be considered as an asset of HMI. However, the agreement actually provides only that Plaintiff [appellee] "shall sell and transfer all of HMI stock to Defendant [appellant]," that Plaintiff [appellee] "shall [resign her] roles as officer and director of HMI, . . . [and that she] shall not claim in interest or to the assets, income (past or future), property, or good will of the said HMI." See exhibit A, pages 18–19. Thus, this HMI section of the agreement makes no provision for transfer of property between husband and wife other than HMI stock itself. As discussed above, HMI's interest in the policy always had been as *owner*, not as *"sub-owner."* Thus, the HMI section of the agreement made no change to the respective status of the parties as to owner or sub-owner interests.

Addressing it construction of a potential argument that characterized the sub-ownership interest as marital property, and thus requiring division pursuant to a disclosure section of the agreement, the court noted:

Defendant [appellant] also might contend that the sub-ownership interest in the policy was marital property and, as such, must be divided pursuant to the agreement's *disclosure* section. That section provides that "all assets not disclosed by either party shall not be controlled by the

waivers and releases of this Agreement, unless such disclosure has been knowledgeably waived by the other party ... [I]f either party is now the owner of any property not disclosed, the non-disclosing party hereby covenants and agrees to pay to the other party, on demand, a sum equal to one-half of the net value of such property ..., plus any attorney's fees occurred."

The same section also provided that "the parties acknowledge that each has listed all of his or her assets on his or her respective financial statement, and neither holds a legal or beneficial interest in any asset of any kind which has not been disclosed to the other.... The parties acknowledge that they have an adequate and sufficient awareness of the assets, liabilities and financial situation of each other." *Id.*

Relatedly, another section of the agreement titled *personal property,* stated "except as otherwise provided herein, the parties have already divided all the furniture ... bank accounts, and personal property of the marriage to their mutual satisfaction." Defendant [appellant] points out that his financial statement, attached as part of the agreement, listed a number of life insurance policies which he held. However, the financial statement of Plaintiff [appellee] did not refer to any life insurance policies.

Plaintiff [appellee], in her testimony at the present hearing, offered as an exhibit a portion of an earlier draft of the agreement. See exhibit B. Defendant [appellant] did not contest the authenticity of this draft, but objected to its admissibility as part of the parties' negotiations. This Court found that the draft should be admitted as an exception to the rule against admissibility of negotiations. The Court of Appeals in *Union Trust v. Resisto Manufacturing,* 169 Md. 381, 181 A. 726 (1935) held that, despite the rule against admissibility of an offer of compromise, "nevertheless admissions of particular facts independent of the offer may be received as evidence tending to establish such facts ... unless it appears that they were made as a concession to induce compromise, or are stated to be made without prejudice." [Citations omitted.] In the present case, there

is nothing to indicate that the inclusion of facts as to the disputed insurance policy was "a concession to induce a compromise or offered without prejudice."

A comparison of the earlier draft (exhibit B, paragraphs 46 through 49) with the actual separation agreement (exhibit A, paragraph 45) indicates that the parties initially discussed the transfer from one to another of four (4) life insurance policies including the currently disputed policy. However, the final draft (exhibit A) excluded all but one (1) of the life insurance policies from transfer. *The presently disputed policy was one (1) of the three (3) excluded.*

Beyond indicating the parties' deliberate choice to exclude the presently disputed insurance policy, the consideration of that policy in the earlier draft makes clear that, if the asset was not technically "disclosed" on Plaintiff's [appellee's] financial statement, its omission was at least knowledgeably waived by Defendant [appellant]. Thus, Defendant [appellant] now has no remedy pursuant to the *disclosure* section of the parties' agreement.

(emphasis added).

## Split-dollar Endorsement as an Asset of HMI

■ The critical factor in this case is the fundamental nature of the policy and, most importantly, the split-dollar endorsement to that policy. We hold that the circuit court correctly ruled that appellee's sub-ownership of the split-dollar endorsement to the policy was not an asset that was required to be transferred from appellee to HMI under paragraph 18 of the separation agreement.[5]

Appellant argues, as he did below, that paragraph 18 of the agreement compelled appellee to surrender her sub-ownership interest in the split-dollar endorsement. He posits that after appellee transferred her ownership interest in HMI, through the assignment of her stock to appellant, she was no longer to

---

5. We modify the trial court's and appellant's use of the term "split-dollar insurance policy." For the reasons *infra,* that appellation is a slight misstatement of the nature of the policy at issue.

claim any interest in any asset or property of HMI. Thus, under appellant's reasoning, her maintenance of the sub-ownership interest (and use of its concurrent power of beneficiary designation) constituted maintenance of an interest in HMI's assets. This argument, however, is belied by the specific split-dollar endorsement at issue and the nature of split-dollar endorsements in general.

By the terms of the split-dollar endorsement to the policy, the owner and sub-owner each had distinct rights as follows:

OWNERSHIP. During the insured's lifetime:

(a) The owner shall have all rights in the policy, subject to the limitations of this Endorsement and to Paragraph (c)

(b) The sub-owner shall have the right to designate the beneficiary and elect an income settlement option with respect to that portion of the death proceeds specified in 2(b) below and the right to assign all rights and interests under this Endorsement. Subject to Paragraph (c), the sub-owner shall also possess any fund value or surrender value which is in excess of the owner's aggregate premium payments, reduced by any indebtedness (along with any unpaid interest) on the policy and any partial surrenders incurred by the sub-owner.

(c) The owner's right to make loans and partial surrenders against the policy and to receive the fund value or surrender value shall be limited to an amount equal to its aggregate premium payments. For purposes of this Endorsement, such aggregate payments shall exclude premiums for any extra-benefit riders issued under this policy and is reduced by any indebtedness (along with unpaid interest) and any partial surrenders incurred by the owner. The sub-owner's right to make loans and to receive any amounts extends to the fund value or surrender value which is in excess of the owner's aggregate premium payments. For any loans against the policy or receipt of any amounts, the signature of either the owner or sub-owner shall be sufficient. Both the owner and the sub-owner acknowledge that, between themselves, they are bound by the limitation of this section

and that the Insurer will recognize the signature of either owner.

BENEFICIARY. The death proceeds shall be paid as follows:

(a) To the owner, an amount equal to the aggregate premiums paid by the owner until date of the insured's death, excluding premiums for any extra-benefit riders issued under this policy, but reduced by any indebtedness (along with any unpaid interest) and by any partial surrenders incurred by the owner on this policy.

(b) To the beneficiary specified on page 3 of this policy, any death proceeds in excess of the amount specified in 2(a) above, but reduced by any indebtedness (along with any unpaid interest) and by any partial surrenders incurred by the sub-owner on this policy.

The above-quoted policy language is typical of split-dollar endorsements, thus a brief description of the mechanism of split-dollar endorsements is appropriate.

Split-dollar endorsements are not types of insurance policies, but, as the name implies, endorsements to insurance policies.[6] The split-dollar concept is a funding arrangement that enables one to obtain life insurance at a lower cost than would be possible otherwise.[7] Such arrangements also permit employers to offer a benefit in order to obtain and retain key employees by providing life insurance at rates less than the typical whole life premium.[8] These goals are achieved by splitting a premium's cost between employee and employer. The arrangement also generally calls for the sharing of premiums in exchange for the sharing of death benefits, cash (living)

---

6. The policy at issue in this case is a Flexible Premium Adjustable Life Insurance Policy, HMI is the owner of this policy subject to the split-dollar endorsement.

7. The format is also used as a funding tool for (tax) deferred compensation and salary continuation plans.

8. A corporation can deduct premium payments if it is not also the beneficiary of the policy. *See* 47A C.J.S. Internal Revenue § 161 n. 37.

values, and other rights and responsibilities. *See e.g.* Rev. Rul. 64–328, 1964–2 C.B. 11; Rev. Rul. 66–110, 1966–1 C.B. 12. At the employee's death, the employer is reimbursed, from the policy proceeds, for its premium payments and the balance is paid to the employee's beneficiary.[9]

Although split-dollar endorsements can take other forms, only the usual endorsement method is relevant.[10] Under this method, the employer is the purchaser and owner of the insurance policy, and a separate agreement between the employer and the insured employee defines the employee's rights in the policy. If the employee leaves the company, a "rollout" occurs whereby the employee reimburses the employer for the premiums contributed (possibly out of the accrued cash value of the policy) and takes full ownership of the policy.[11]

The first section of the circuit court's ruling conforms with our general observations concerning split-dollar endorsements and the guidance provided by the proposed and final regula-

---

**9.** In 2002, the Internal Revenue Service released proposed regulations (Notice 2002–8) defining split-dollar insurance as an arrangement under which one party pays the premiums on the policy with the right to recover all or a part of those premiums from the policy proceeds. *See* 47A C.J.S. Internal Revenue § 294 (citing Prop. Reg. sec 1.61–22(b)(1)); *see also* Charles L. Ratner, *Planning Techniques for Large Estates*, SL030 ALI–ABA 1, 10 (2005). Notice 2002–08 provides guidance regarding the tax treatment of existing split dollar arrangements and is specifically applicable to agreements reached or modified after its inception. We use its definition of split-dollar arrangements and conception of ownership, however, as guidance for our general discussion.

**10.** One additional form of a split-dollar endorsement is collateral assignment plan whereby a policy is initially obtained by an employee and the employee makes a collateral assignment of the policy to the employer in return for the employer's paying premiums on the plan. Split-dollar agreements may also be between private parties.

**11.** Notice 2002–08, changed the traditional tax treatment of split-dollar endorsements based on an "economic benefit regime and a loan regime." The tax consequences now being largely dependent on which party *owns* the insurance contract and "for these purposes, the 'owner' generally is the person named as the policy owner." 47A C.J.S. Internal Revenue § 161 (citing Prop. Reg. sec. 1.61–22(c)(1)(ii)). TD 9092, 2003–2 C.B. 1055 also establishes that the "owner is generally the person named as the policy owner." Ratner, *supra*, at 13.

tions cited. Under the separation agreement, appellee could no longer claim any interest in the assets of HMI. But the agreement does not specifically compel appellee to surrender her sub-ownership interest in the policy, only her stock ownership of HMI. The asset itself is the policy, which HMI owned before the agreement and continues to own after it. HMI's asset, however, is subject to a split-dollar endorsement. The endorsement to that asset, though, is not the asset itself. Appellant, essentially, makes the mistake of equating the two. HMI owns a life insurance policy (that names appellee as the insured) containing a split-dollar equity endorsement method of premium payment.[12] The nature of this asset has not been altered by the parties' agreement. Thus, we hold that, because the fundamental nature and effect of the policy has not been altered by the separation agreement, the agreement itself does not compel transfer of appellee's sub-ownership in the policy to appellant.

Given the positions of the parties on appeal, we are not required to delve into the vagaries of HMI's and appellee's continuing relationship under the policy or the split-dollar endorsement. Our construction ends with our holding that this relationship is not affected by the terms of the agreement.

## Evaluation of the Draft Agreement

Appellant's argument at trial, and in this appeal, focused on enforcement of the waiver, contained in paragraph 18 of the agreement, and its impact on appellee's sub-ownership interest in the endorsement to the policy. Before this Court, appellant also argued that the trial court erred by allowing extrinsic evidence (the initial draft of the agreement, *supra*, outlining the transfer of various insurance policies owned by appellant, appellee and HMI) in construing the final agreement. We find this additional argument unpersuasive because

---

12. Appellee also overreaches, claiming that the policy is jointly owned and inferring this finding of fact to the lower court's opinion. This is a misstatement; the policy is owned by HMI. HMI and appellee are not joint policy-owners in the traditional sense, but in the specific context of a split-dollar endorsement.

appellant was the party who, in fact, introduced the prior draft at trial.

Although our discussion, *supra*, is dispositive of the policy ownership interest of the parties, we shall briefly discuss appellant's claim that the court erred in its consideration of the preliminary draft of the separation agreement.

█ Initially, we note that the trial court misidentified the positions of the parties with regard to the introduction of the draft agreement. The record reveals that the draft was offered by *appellant's* attorney in an effort to show that both parties agreed that HMI owned the policy. The exhibit was objected to by *appellee's* counsel. An exchange between trial counsel and the court ensued as follows:

PLAINTIFF'S [APPELLEE'S] COUNSEL: Your honor, I am definitely going to object to this exhibit that is being offered now. It is—purports to be pages out of a previous draft of a separation agreement that was never signed by the parties. We have the final agreement, and I would argue strenuously that going through the machinations and negotiations of the parties is totally irrelevant. . . .

DEFENDANT'S [APPELLANT'S] COUNSEL: If I may be heard, Your Honor. First of all, the document is admissible for a number of reasons . . . There seems to be some question here. Perhaps this document, the separation agreement, is not as clear on its face for the simple reason that Ms. Wright is unwilling to accept apparently, that this subject policy was an asset of Hartley Marine, and therefore should be conveyed to Hartley Marine.

THE COURT: Do you want to proffer what the relevance is in terms of the content of what this is?

DEFENDANT'S [APPELLANT'S] COUNSEL: . . . These are a group of documents. The first document is a document that was prepared by Ms. Bennett's then attorneys, and it lists some four life insurance policies, one of the policies being the policy that—the Mass Mutual policy that brings us here today.

The court subsequently admitted the exhibit "for the limited purpose of any admission by [appellee] or statement by [appellee] of [appellee's] understanding of ownership; not for what the parties' agreement was, but just for [appellee's] understanding of ownership as to the policies, if it provides that."

■ Appellant now complains of error by the trial court in admitting an exhibit that he introduced at trial. First, having been the sponsor of the exhibit at trial, appellant cannot now logically complain of a ruling on evidence in his favor. *See Penrose v. Canton Nat. Bank*, 147 Md. 200, 211, 127 A. 852 (1925). Second, although the trial court's admission of the exhibit may ultimately have been contrary to his interest, "when a defendant introduces in evidence a statement of a plaintiff in order to show favorable items, the items in it which go to prove the plaintiff's claim are also in evidence." *J.A. Laporte Co. v. Penn.-Dixie Cement Co.*, 164 Md. 642, 649, 165 A. 195 (1933). Therefore, we need not determine whether the final agreement should have been interpreted and construed by the court on its face, or whether it was so ambiguous as to necessitate the production of extrinsic evidence, *i.e.*, the draft. *See Baltimore Luggage Co. v. Ligon*, 208 Md. 406, 413, 118 A.2d 665 (1955).

Finding no error, we shall affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED; COSTS ASSESSED TO APPELLANT.**