944 A.2d 1167

**STATE of Maryland**

v.

**PHILIP MORRIS INCORPORATED et al.**

**No. 2844, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

March 27, 2008.

Joshua N. Auerbach (Steven M. Sullivan, Douglas F. Gansler, Attorney General, on the brief), Baltimore, MD, for Appellant.

Robert Brookhiser (Elizabeth B. McCallum, Howrey, L.L.P., on the brief), Washington, D.C., (Deborah L. Robinson, Robinson, Woolson, P.A., Robert T. Franklin, Franklin & Prokopik, P.C., on the brief), Baltimore, MD, for Appellee.

Panel: DAVIS, ADKINS and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

DAVIS, J.

This case involves a dispute between appellant, the State of Maryland, and appellees, Philip Morris USA, Inc., R.J. Reynolds Tobacco Co. and Lorillard Tobacco Co. (collectively, the original participating manufacturers) and more than forty

small tobacco manufacturers (collectively, the subsequent participating manufacturers). In 1998, the original participating manufacturers and the State, along with fifty-one other states and territories (collectively, the settling states), signed the Master Settlement Agreement (MSA). The MSA resolved the settling states' claims of wrongful marketing and advertising of cigarettes, as well as damages based upon the costs of treating smoking-related illnesses. In exchange for a release of liability, the original participating manufacturers [1] and subsequent participating manufacturers, who later joined the MSA, agreed to make annual payments that would be allocated among the settling states.

In March 2006, the independent auditor, responsible for determining the annual MSA payments, refused appellees' request to reduce their payments for the 2003 calendar year. When the dispute continued, appellees requested arbitration pursuant to § XI(c) of the MSA. The State refused appellees' demand and, on May 18, 2006, it sought declaratory relief from the Circuit Court for Baltimore City (Brown, J.), confirming that the independent auditor acted properly by not reducing the MSA payment. The original participating manufacturers responded on July 14, 2006, by filing a Motion to Compel Arbitration. Thereafter, the subsequent participating manufacturers joined the original participating manufacturers' motion.

During the October 5, 2006 motions' hearing, the parties argued, based upon the language and structure of the MSA, whether the present dispute was subject to arbitration or the exclusive jurisdiction of the Circuit Court for Baltimore City. In a written opinion, the court found that the arbitration provision was "clear" and applicable and rejected the State's arguments, opining that they were "clearly in conflict with" the language of the MSA. Accordingly, on January 19, 2007, the Circuit Court for Baltimore City ordered that arbitration be compelled and denied the State's Motion for Declaratory

---

**1.** Brown & Williamson was an original party to the MSA, but has since merged with R.J. Reynolds Tobacco Co.

Order. The State, thereafter, filed a timely notice of appeal, in which it presents the following questions for our review:

1. Under the 1998 Master Settlement Agreement between the State of Maryland and participating tobacco manufacturers, is the issue of whether the State was "diligent" in its enforcement of Maryland*s escrow statute against non-participating manufacturers (NPMs) (a) an issue within the Circuit Court for Baltimore City*s "exclusive jurisdiction" to implement and enforce the MSA, or instead (b) an issue subject to arbitration because it is a dispute "arising out of or relating to calculations performed by, or ... determinations made by" the accounting firm responsible for calculating the amount that the participating tobacco manufacturers owe the State under the MSA?

2. Do a series of 2003 agreements, subsequent to the Master Settlement Agreement, between the State and the original participating tobacco manufacturers, resolving the issue of the State*s "diligent enforcement" of its NPM escrow statute with respect to 1999–2002 tobacco sales, render non-arbitrable the present dispute concerning the State*s diligence in calendar year 2003, because the State*s enforcement activities in calendar year 2003 necessarily applied only to 1999–2002 tobacco sales?

For the reasons that follow, we hold that the question of whether the State was diligent in its enforcement of Maryland's escrow statute against non-participating manufacturers is an issue subject to arbitration and that the series of 2003 settlement agreements between the State and the original participating manufacturers do not render the present dispute non-arbitrable. Accordingly, we affirm the judgment of the Circuit Court for Baltimore City.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Master Settlement Agreement

In 1996, the State brought suit in Baltimore City Circuit Court against the major American tobacco companies, alleging

that the companies were engaged in wrongful advertising and marketing of cigarettes. Other states initiated similar actions in their own courts. In November 1998, the attorneys general of forty-six states, including Maryland and six territories, entered into a global agreement known as the MSA to resolve the litigation.

Under the MSA, the settling states agreed to dismiss any pending action and release all past and future claims in exchange for the original participating manufacturers to restrict the manner in which they market and advertise tobacco products and for each original participating manufacturer to make a substantial annual payment to be allocated among the settling states. On December 1, 1998, the Circuit Court for Baltimore City entered a consent decree and final judgment approving the MSA, thereby settling the previous civil action initiated by the State.

As an incentive for additional tobacco manufacturers to join the MSA, the agreement provides that other tobacco manufacturers may voluntarily agree to abide by its provisions in the future and, in return, the settling states would release all past and future claims against them. The MSA refers to the tobacco manufacturers who enter the global agreement after its execution as the "subsequent participating manufacturers." [2] Under the MSA, the subsequent participating manufacturers, like the original participating manufacturers, make annual payments to the settling states.

The MSA annual payments are used to help the settling states achieve "significant funding for the advancement of public health" and "the implementation of important tobacco-related public health measures." Pursuant to the MSA, the original participating manufacturers and the subsequent participating manufacturers (collectively, the participating manufacturers) do not make annual payments directly to the State or the other individual settling states. Instead, each partici-

---

2. Since November 1998, more than forty subsequent participating manufacturers have joined the MSA.

pating manufacturer is required to make a single, nationwide annual payment into an escrow account on or before April 15.[3]

The participating manufacturers' payment obligations are calculated annually by an "Independent Auditor"[4] who shall:

[C]alculate and determine the amount of all payments owed pursuant to [the MSA], the adjustments, reductions and offsets thereto (and all resulting carry-forwards, if any), the allocation of such payments, adjustments, reductions, offsets and carry-forwards among the Participating Manufacturers and among the Settling States, and shall perform all other calculations in connection with the foregoing.

MSA § XI(a); *see* MSA § IX(c)(2).

The independent auditor calculates each participating manufacturer's annual payment obligation pursuant to a comprehensive formula contained within the MSA. The calculation begins with each original participating manufacturer paying into an escrow account its relative market share of the base amount for the calendar year. *See* § IX(c)(1). This amount is then subject to several reductions and adjustments. One adjustment is the "Non–Participating Manufacturer Adjustment" (NPM Adjustment), which is at issue. MSA §§ IX(c)(j), XI(a)(1).

Given the restrictions imposed by the MSA, the participating tobacco manufacturers were concerned that they would incur a competitive disadvantage to the non-participating manufacturers, who were not subject to the MSA's strict market-

---

**3.** The funds are subsequently allocated among the settling states according to formulae set forth in the MSA. Pursuant to the "allocable shares," Maryland is entitled to 2.2604570 percent of the participating manufacturers' annual payment. *See* MSA § II(f). The State has received approximately one billion dollars since the MSA was signed and has used the money to fund the Tobacco Use Prevention and Cessation Program, the Cancer Prevention, Education, Screening and Treatment Program and other State programs that serve vital public health, education and tobacco prevention purposes. *See* Md.Code Ann., State Fin. & Proc. § 7–317 (2006).

**4.** The accounting firm, Price Waterhouse Coopers, has served as the independent auditor since the inception of the MSA.

ing restrictions and payment obligations. The NPM Adjustment attempts to level the marketplace by reducing the annual payment obligation of the participating manufacturers if, as a collective group, it is proven that they lost market share to the non-participating manufacturers.

The MSA provides that participating tobacco manufacturers may be eligible to take a NPM Adjustment if (1) the independent auditor determines that, during the year in question, the participating manufacturers collectively lose more than two percent of their pre-MSA market share to non-participating manufacturers and (2) an economic consulting firm determines that the MSA was a "significant factor" contributing to that loss. MSA § IX(d)(1).

Even if the two stated conditions are satisfied, thereby making the NPM Adjustment applicable, the MSA contains a mechanism for a settling state to avoid a reduction of payment. The MSA provides:

A Settling State's Allocated Payment shall not be subject to an NPM Adjustment: (i) if such *Settling State continuously had a Qualifying Statute . . . in full force and effect* during the entire calendar year immediately preceding the year in which the payment in question is due, and *diligently enforced the provisions of such statute* during such entire calendar year. . . .

MSA § IX(d)(2)(B) (emphasis added). Accordingly, if a state has a "qualifying statute" in full force and effect and diligently enforces that statute, the auditor must reallocate that state's share of the NPM Adjustment among the other states that do not qualify, "pro rata in proportion to their respective Allocable Shares." MSA § IX(d)(2)(C).

Maryland enacted the model "qualifying statute" contained in Exhibit T to the MSA, which is codified as Maryland's Escrow Act (Chapter 169 of the Acts of 1999, as amended by Chapter 141 of the Acts of 2001).[5] The Escrow Act requires

---

5. The other settling states also enacted the model qualifying statute contained in Exhibit T.

all non-participating tobacco manufacturers to deposit into escrow a fixed sum per cigarette sold that is slightly less than the per-cigarette cost imposed by the MSA on participating manufacturers. Escrow Act § 3. These escrowed funds may ultimately be used to satisfy a judgment that the State may obtain against a non-participating manufacturer. *Id.* § 3(b)(2)(i). If the funds are not so used within twenty-five years, they are returned to the non-participating manufacturer. *Id.* § 3(b)(2)(iii).

### B. The Present Dispute

The root of the dispute that underlies this appeal is the independent auditor's calculation of the participating manufacturers' annual payments for the 2003 calendar year. In 2003, the independent auditor determined that the participating manufacturers' total national market share was approximately six percent lower than their market share pre-MSA, satisfying the first condition of the NPM Adjustment. In March 2006, an economic consulting firm, selected pursuant to the MSA, determined that the MSA was a "significant factor," contributing to that loss.[6] Accordingly, the participating manufacturers requested that the auditor apply the 2003 NPM Adjustment to their April 2006 payments.

Maryland and the other settling states, however, urged the auditor to deny the NPM Adjustment on the ground that the settling states "diligently enforced" their qualifying statutes. After receiving letters from the State and participating manufacturers, the independent auditor released its preliminary calculations of the 2003 annual payments, which did not include the NPM Adjustment. Recognizing that the parties disputed whether the NPM Adjustment should apply, the auditor stated that "the Independent Auditor is not charged with the responsibility under the MSA of making a determination regarding this issue. More importantly, the Independent Auditor is not qualified to make the legal determination as to

---

6. The MSA provides that the "significant factor" determination is not subject to appeal.

whether any particular Settling State has 'diligently enforced' its Qualifying Statute."

Although the independent auditor did not, in its preliminary calculations or elsewhere, explicate its current approach to determining whether a NPM Adjustment applies, apparently its approach was to *presume* that the settling states were diligently enforcing their qualifying statutes. When the auditor issued its final calculations in March 2006, the calculations again did not include the NPM Adjustment.

Following the release of the independent auditor's final calculations, on May 22, 2006, counsel for the participating tobacco manufacturers wrote former Attorney General Joseph Curran to request that the State submit to arbitration on the issue of whether Maryland diligently enforced the Escrow Act during the 2003 calendar year.[7]

On May 18, 2006, the State asked the Baltimore City Circuit Court for declaratory relief, declaring that the auditor properly determined not to reduce the participating manufacturers' MSA payments to reflect a NPM Adjustment.[8] As the approving court of the MSA, Baltimore City Circuit Court "retain[ed] exclusive jurisdiction for the purposes of implementing and enforcing [the MSA]," except as otherwise provided in the MSA. At issue is one of the exceptions, an arbitration provision governing the resolution of disputes regarding the auditor's calculations and determinations:

Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning the operation or application of any of the adjustments, reductions, offsets, carry-for-

---

7. The tobacco companies made similar demands of the other signatories to the MSA.

8. The State filed two motions that day: "Motion to Enforce Settlement Agreement by Enforcement or Declaratory Order Pursuant to the Master Settlement Agreement Approved *By Decree of This Court on December 1, 1998.*" and "Motion for Stay of Threatened Arbitration or, Alternatively, for a Declaratory Order Regarding Non–Arbitrability."

wards and allocations described in subsection IX(j) or subsection XI(i)) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge. Each of the two sides to the dispute shall select one arbitrator. The two arbitrators so selected shall select the third arbitrator. The arbitration shall be governed by the United States Federal Arbitration Act.

MSA § XI(c).

On July 14, 2006, the original participating manufacturers filed a Motion to Compel Arbitration and to Dismiss or, in the Alternative, Stay the State's Motions. Thereafter, the subsequent participating manufacturers joined the original participating manufacturers' Motion to Compel Arbitration.[9] The Circuit Court for Baltimore City heard arguments on October 5, 2006. After examining the provisions of the MSA in order to determine whether the question of diligent enforcement was arbitrable, the court concluded, in its written opinion, that "[t]he language of the MSA is clear in its directive to submit a dispute such as this one to arbitration" and that "[t]he state's argument based on logistics and impracticality is unpersuasive and fails to overcome the controlling language of the MSA." Accordingly, on January 19, 2007, the court ordered that arbitration be compelled. The State subsequently filed this appeal.

## ANALYSIS

### I

The State comprehensively argues that a determination of whether it "diligently enforced" its Escrow Act does not "arise out of" or "relate to" a "calculation performed by" or "any determination made by" the independent auditor. Accordingly, the State maintains that the question of diligent enforce-

---

9. Because the subsequent participating manufacturers were not parties to the original litigation, they filed an unopposed motion to intervene in connection with the Motion to Compel Arbitration.

ment must be resolved by the Circuit Court for Baltimore City. In response, appellees argue that, because the underlying dispute is over the independent auditor's determination not to apply the NPM Adjustment, it clearly falls within the MSA's arbitration provision. Thus, to answer the question of whether diligent enforcement is subject to arbitration or the exclusive jurisdiction of the Baltimore City Circuit Court, we look to the plain language of the MSA.[10]

---

**10.** We are not alone in reviewing the issue *sub judice.* Currently, forty-five states and Puerto Rico have examined and interpreted the MSA. Forty-four of those forty-five states have determined that the dispute is subject to arbitration. The Fourteenth Judicial District Court of Louisiana denied the participating manufacturers' Motion to Enforce Arbitration. Although not binding, the decisions "cast a noticeable shadow on the issue."

After reviewing the many decisions, we found the decisions of Connecticut, Massachusetts and New Hampshire particularly thorough, insightful and persuasive.

Listed are each state's most recent decision in alphabetical order: *Alabama v. Philip Morris Inc.,* No. CV–1998–2941–PR (Ala.Cir.Ct. Mar. 9, 2007); *Alaska v. Philip Morris Inc.,* No. 1 JU–97–915 CI (Alaska Super.Ct. Feb. 5, 2007); *Arizona v. Honorable Timothy J. Ryan,* No. 1 CA § 07–0083 (Ariz.Ct.App. May 24, 2007); *Arkansas v. American Tobacco Co.,* No. IJ1997–2982, 2006 WL 5400237 (Ark.Cir.Ct. Nov. 29, 2006); *In re Tobacco Cases,* No. JCCP 4041 (Cal.Ct.App. Dec. 5, 2006); *Colorado v. R.J. Reynolds Tobacco Co.,* No. 97CV3432 (Colo.Dist.Ct. July 19, 2006); *Connecticut v. Philip Morris Inc.,* 279 Conn. 785, 905 A.2d 42 (2006); *Delaware v. Philip Morris USA Inc.,* 925 A.2d 504 (Del.2007); *District of Columbia v. Philip Morris USA Inc.,* No. 2006 CA 003176 B (D.C.Super.Ct. Sept. 26, 2006) *Hawaii v. Philip Morris USA,* No. 06–1–0695 (Haw.Cir.Ct. Aug. 3, 2006); *Idaho v. Philip Morris Inc.,* No. 99567 (Idaho Oct. 12, 2006); *Illinois v. Lorillard Tobacco Co.,* No. 104613, 225 Ill.2d 657, 314 Ill.Dec. 832, 875 N.E.2d 1119 (Ill. Sept. 26, 2007); *Indiana v. Philip Morris Tobacco Inc.,* No. 49D07–9702–CT–0236 (Ind.Super.Ct. Feb. 7, 2007); *Iowa v. Philip Morris USA.,* No. 06–1486 (Iowa Feb. 16, 2007); *Kansas v. R.J. Reynolds Tobacco Co.,* No. 96–CV–919 (Kan.Dist.Ct. July 10, 2007); *Kentucky v. Philip Morris USA,* 244 S.W.3d 116 (Ky.Ct.App.2007); *Louisiana v. Philip Morris USA, Inc.,* VS. NO.1998–6473 (La.Dist.Ct. May 31, 2007); *Maine v. Philip Morris Inc.,* 928 A.2d 782 (Me.2007); *Massachusetts v. Philip Morris Inc.,* 448 Mass. 836, 864 N.E.2d 505 (2007); *Michigan v. Philip Morris USA.,* No. 273665, 2007 WL 1651839 (Mich.Ct.App. June 7, 2007); *Missouri v. American Tobacco Co.,* No. 22972–01465 (Mo.Cir.Ct. Jan. 22, 2007); *Montana v. Philip Morris Inc.,* No. CDV–1997–306 (Mont.Dist.Ct. Mar. 28, 2007); *Nebraska v. R.J. Reynolds Tobacco Co.,* No. CI 06–1656 (Neb.Dist.Ct. Aug. 28, 2006); *Nevada v. Second Judicial Dist. Ct. of the State of Nevada,* No. 49426 (Nev. May 21, 2007); *New Hampshire v.*

**152**

## A. Plain Language of the MSA

 The construction of a written contract is a question of law, subject to *de novo* review by an appellate court. *Bennett v. Wright,* 167 Md.App. 291, 295, 892 A.2d 1164 (2006). As a fundamental principle of contract construction, we seek to ascertain and effectuate the intention of the contracting parties. The "primary source for determining the intention of the parties is the language of the contract itself." *Id.* (citing *Young v. Anne Arundel,* 146 Md.App. 526, 585–86, 807 A.2d 651, *cert. denied,* 372 Md. 432, 813 A.2d 259· (2002); *see General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985)) ("[C]lear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant."). In ascertaining the true meaning of a contract, "the contract must be construed in

---

*Philip Morris USA Inc.,* 155 N.H. 598, 927 A.2d 503 (2007); *New Mexico v. American Tobacco Co.,* No. SF 97–1235(C) (N.M. Dist. Ct. June 29, 2007); *New Jersey v. Philip Morris USA Inc.,* No. C–103–06 (N.J.Super.Ct. Sept. 14, 2007); *New York v. Philip Morris Inc.,* 8 N.Y.3d 574, 838 N.Y.S.2d 460, 869 N.E.2d 636 (2007); *North Carolina v. Philip Morris USA Inc.,* No. 98 CVS 14377–I, 2006 WL 3490937 (N.C.Super.Ct. Dec. 4, 2006); *North Dakota v. Philip Morris Inc.,* 732 N.W.2d 720 (N.D.2007); *Ohio v. R.J. Reynolds Tobacco Co.,* No. 97CVH05–5114 (Ohio Ct. of Common Pleas Sept. 25, 2006); *Oklahoma v. R.J. Reynolds Tobacco Co.,* No. CJ–96–1499 (Okla.Dist.Ct. Jan. 30, 2007); *Oregon v. Philip Morris USA Inc.,* No. 0604–04252 (Or.Cir.Ct. Sept. 6, 2006); *Pennsylvania v. Lorillard Tobacco Co.,* No. 298 D.C.2007 (Pa.Commonw.Ct. Mar. 21, 2007); *Puerto Rico v. Brown & Williamson,* No. 97–1910 (D.P.R. Sept. 26, 2007); *Rhode Island v. Brown & Williamson Tobacco Corp.* C.A. No. 97–3058 (R.I.Super.Ct. Mar. 27, 2007); *South Carolina v. Brown & Williamson Tobacco Corp.,* No. 97–CP–40–1686 (S.C. Ct. of Common Pleas Apr. 27, 2007); *South Dakota v. R.J. Reynolds Tobacco Co.,* No. 24311 (S.D. Jan. 5, 2007); *Tennessee v. Brown & Williamson Tobacco Corp.,* No. M2007–00476–COA–R9–CV (Tenn.Ct.App. Mar. 16, 2007); *Utah v. R.J. Reynolds Tobacco Co.,* No. 2:96–CV–0829 (D.Utah Dec. 15, 2006); *Vermont v. Philip Morris USA, Inc.,* No. S 0463–06–CnC (Vt.Super.Ct. July 14, 2006); *Virginia v. Philip Morris USA, Inc.,* No. 062245 (Va. Feb. 21, 2007); *Washington v. Philip Morris USA,* No. 59036–7–I (Wash.Ct.App. Feb. 21, 2007); *West Virginia v. American Tobacco Co.,* No. 94–C–1707 (W.Va.Cir.Ct. Mar. 20, 2007); *Wisconsin v. Philip Morris Inc.,* No. 97–CV–0328 (Wis. Cir. Ct. June 11, 2007); *Wyoming v. Philip Morris USA,* No. 26718 (Wyo.Dist.Ct. Jan. 8, 2007).

its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Cochran v. Norkunas,* 398 Md. 1, 17, 919 A.2d 700 (2007) (citing *Sagner v. Glenangus Farms,* 234 Md. 156, 167, 198 A.2d 277 (1964)).

### i. A MSA Court's Exclusive Jurisdiction is Restricted

Pursuant to § VII(a) of the MSA, Baltimore City Circuit Court has primary enforcement responsibility. The MSA enforcement provision provides:

> *Jurisdiction.* Each Participating Manufacturer and each Settling State acknowledge that the Court: (1) has jurisdiction over the subject matter of the action identified in Exhibit D in such Settling State and over each Participating Manufacturer; (2) shall retain exclusive jurisdiction for the purposes of implementing and enforcing this Agreement and the Consent Decree as to such Settling State; and (3) *except as provided in subsections IX(d), XI(c) and Exhibit O,* shall be the only court to which disputes under this Agreement or the Consent Decree are presented as to such Settling State.

*Id.* (emphasis added). By virtue of this language, while Baltimore City Circuit Court has exclusive jurisdiction as to matters arising within the State, the court's jurisdiction does not extend to matters involving section XI(c) of the MSA, which provides for arbitration.[11] Thus, § XI(c) constitutes an area of authority reserved from Baltimore City Circuit Court's general enforcement jurisdiction.

---

11. The State argues that the placement of the arbitration provision within the "Calculation and Disbursement of Payments" section and not the "Enforcement" or even "Payment" sections is telling. Section XVIII(i), however, specifically provides that "[t]he headings of the sections and subsections of this Agreement are not binding and are for reference only and do not limit, expand or otherwise affect the contents or meaning of this Agreement." As we will discuss *supra,* the placement of the arbitration clause is logical.

### ii. MSA § XI(c) Unambiguously Requires Arbitration

■ The arbitration provision in § XI(c) of the MSA clause provides:

> (c) *Resolution of Disputes. Any dispute,* controversy or claim *arising out of or relating to calculations* performed by, *or any determinations made by, the Independent Auditor (including, without limitation, any dispute concerning* the *operation* or *application* of any of the adjustments, reductions, offsets, carry-forwards and allocations described in *subsection IX(j)* or subsection IX(i)) *shall* be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge.

*Id.* (emphasis added). The general phrase, "any dispute, controversy or claim arising out of or relating to . . . ." delimits the substantive scope of the right to arbitrate under § XI(c), while the narrower parenthetical phrase that immediately follows the general phrase, describes a subset of disputes that clearly fall within the scope of arbitration and shall be submitted to arbitration. This subset illustrates the range of disputes included in the general clause and demonstrates that the MSA drafters intended that the listed disputes would be subject to arbitration. *See, e.g., Puerto Rico Maritime Shipping Auth. v. I.C.C.,* 645 F.2d 1102, 1112 (1981) ("including, without limitation" clause identifies examples that are specifically included in the general language they follow).

Focusing on the language of the narrower, parenthetical phrase, it is necessary to "connect the dots." Relevant to the issue *sub judice* is section IX(j), entitled "Order of Application of Allocations, Offsets, Reductions and Adjustments." Pursuant to § IX(j), the sixth clause embodies the NPM Adjustment and sets forth that "the NPM Adjustment shall be applied to the results of clause 'Fifth' pursuant to subsections IX(d)(1) and (d)(2). . . ."

Connecting the dots to § IX(d)(1), this section discusses the calculation of the NPM Adjustment for the original participating manufacturers, including the significant factor determina-

tion. More importantly, section IX(d)(2)(A) provides that the NPM Adjustment "shall apply to the Allocated Payments of all Settling States, except as provided" in § IX(d)(2)(B), which sets forth that "[a] Settling State's Allocated Payment shall not be subject to an NPM Adjustment . . . if such Settling State continuously had a Qualifying Statute . . . in full force and effect during the entire calendar year . . . and *diligently enforced* the provisions of such statute during such entire calendar year. . . ." *Id.* (emphasis added). Of import, this is the *only* MSA provision that mentions "diligent enforcement."

After giving effect to each clause and construing the MSA in its entirety, arbitration is mandatory. *See Cochran,* 398 Md. at 17, 919 A.2d 700. The parenthetical "without limitation" clause directly identifies the diligent enforcement issue and sets forth that diligent enforcement, along with any other issue regarding the NPM Adjustment, is subject to arbitration. *See, e.g., Connecticut v. Philip Morris, Inc.,* 279 Conn. 785, 905 A.2d 42, 49–50 (2006) (opining that the "conclusion that the underlying dispute is arbitrable is buttressed by referring to the specific examples of arbitrable disputes enumerated in section IX(c) of the agreement"); *Massachusetts v. Philip Morris, Inc.,* 448 Mass. 836, 864 N.E.2d 505, 512 (2007) (clause "specifically includes disputes related to the adjustments described in IX(j))".

Furthermore, the general language that "any dispute" "arising out of or relating to" "calculations performed by or determinations made by, the Independent Auditor," on even a basic level, makes the present dispute arbitrable, as the question of diligent enforcement "arises out of" or "relates to" the auditor's calculations and determinations. The State contends, however, that a finding of lack of diligence will "at most, result in a *future* calculation or determination made by the auditor." The State relies on the California decision, *In re Tobacco Cases I,* 124 Cal.App.4th 1095, 1108, 21 Cal.Rptr.3d 875 (2004), in support of its proposition. In *In re Tobacco Cases I,* the state of California petitioned the court for a determination as to whether a Danish participating manufacturer was responsible for a Latvian cigarette manufacturer's

sales in the United States. On appeal, the court held that a dispute concerning the Danish company's obligation to make a payment for cigarettes sold by the Latvian company "will, at most, result in *future* calculations or determinations made by the Auditor regarding [the Danish company's] obligations under the MSA." *Id.* at 1109, 21 Cal.Rptr.3d 875.

The Danish company's obligation, in *In re Tobacco Cases I*, to make payments for cigarettes sold and the auditor's calculations and determinations were attenuated, whereas a determination of whether Maryland diligently enforced the Escrow Act will directly and immediately result in a different MSA calculation. In the instant case, the auditor did not apply the NPM Adjustment to reduce the participating manufacturers' annual payment, a determination that resulted in a calculation greater than if the auditor had applied the NPM Adjustment. Accordingly, the question of diligent enforcement "arises out of" or "relates to" the auditor's calculations and determinations because it directly affects the amount of MSA payment the State and all other settling states receive. *See, e.g., New York v. Philip Morris, Inc.,* 8 N.Y.3d 574, 838 N.Y.S.2d 460, 869 N.E.2d 636, 639 (2007) ("The plain language of the MSA compels arbitration."); *State ex rel. Stenehjem v. Philip Morris,* 732 N.W.2d 720, 727 (N.D.2007) ("[W]e believe the plain and unambiguous language of the settlement agreement requires arbitration of the parties' dispute."). As such, the dispute "relates to" the "operation" or "application" of an "adjustment" or "allocation pursuant to IX(j)."

### iii. Independent Auditor has express authority to make a "diligent enforcement" determination

The structure of the arbitration clause provides clear evidence of the parties' mutual understanding that, in performing the calculations and making the determinations, the independent auditor is not simply to make mathematical computations, as the State suggests, but to make and act upon preliminary determinations as to the operation and application of the adjustments, reductions, offsets, carry-forwards and alloca-

tions, if appropriate, in completing those calculations and determinations.

Section XI(a) expressly empowers the independent auditor to "calculate *and determine* the amount of all payments owed pursuant to this Agreement, *the adjustments,* reductions and offsets thereto (and all resulting carry-forwards, if any), *the allocation of such payments, adjustments,* reductions, offsets and carry-forwards among the Participating Manufacturers and among the Settling States[.]" *Id.* (emphasis added). This provision confirms the linkage between the final amounts of all payments owed pursuant to the MSA and the amounts of all adjustments, reductions and offsets applicable to those payments. Accordingly, the auditor has authority to make "determinations" regarding appellees' payments, including the "application" and "allocation" of a NPM Adjustment based on the diligent enforcement exemption.

Furthermore, § IX(j) establishes the mandatory process by which "[t]he payments due under this Agreement shall be calculated" and sets forth in a list of thirteen sequentially numbered clauses, each of which describes or references a particular adjustment, reduction or offset that "shall be applied to" the results of the immediately preceding clause, providing that, "[i]n the event that a particular adjustment, reduction or offset referred to in a clause below does not apply to the payment being calculated, the result of the clause in question shall be deemed to be equal to the result of the immediately preceding clause." MSA § IX(j). This clause requires the independent auditor, as the party responsible for performing the calculation in question, to make a threshold determination whether the adjustment is applicable before computing its amount and modifying the amount of the subject payment by applying the adjustment.

Moreover, there is no MSA provision that delegates any payment-related issue to the MSA court. If the parties had intended to create an exception to the auditor's authority under § IX(a) to make payment-related determinations, as they did with the "significant factor" determination, they

expressly would have done so.[12] To sever the question of diligent enforcement from the NPM Adjustment, thereby placing it before MSA courts is illogical and at odds with the MSA. The diligent enforcement question, mentioned in the MSA only as part of the NPM Adjustment, is an indispensable underlying issue of the overall NPM Adjustment and, thus, the determination and calculations are inextricably linked. *See New Hampshire v. Philip Morris,* 155 N.H. 598, 927 A.2d 503, 512 (2007) ("Court is not aware of, any provisions in the MSA other than those regarding the NPM Adjustment, where the diligent enforcement of a Qualifying Statute has any relevance.").

Accordingly, the MSA empowers and deems the independent auditor competent [13] to determine, as part of a calculation or determination, whether any particular offset, adjustment, reduction or carry-forward is applicable to appellees' payment.[14] *See Connecticut v. Philip Morris, Inc.,* 279 Conn. 785, 905 A.2d 42, 49 (2006) (holding that the "underlying dispute over the independent auditor's decision not to apply the adjustment falls within the scope of the arbitration provision because it directly involves a *determination* of the indepen-

---

**12.** Pursuant to § IX(d)(1)(C), "a nationally recognized firm of economic consultants (the 'Firm') shall determine whether the disadvantages experienced as a result of the provisions of this Agreement were a significant factor contributing to the Market Share Loss for the year in question." The subsection goes on to discuss how the economic consultant must be chosen and retained.

**13.** Sections IX(a) and IX(j) explicitly refute the State's claim that the auditor lacks "competency to determine" whether the State has diligently enforced its obligation. If the auditor's role was limited to mathematical computations, the MSA would not have required arbitration of disputes related to an auditor's determination by three former federal judges. *Connecticut v. Philip Morris, Inc.,* 279 Conn. 785, 905 A.2d 42 (2006), *aff'g* 2005 WL 2081763, *36 (Conn.Super.Ct. Aug.3, 2005) ("Auditor is not simply ... to make mathematical computations of the sort it routinely performs as a certified public accountant").

**14.** The State's claim that the auditor acknowledged in its March 7, 2006 Notice of Preliminary Calculation that it is "not qualified" to decide diligent enforcement is irrelevant. The MSA's language controls and not the auditor's interpretation.

dent auditor") (emphasis supplied); *New Hampshire*, 927 A.2d at 510.

Because the clear and unambiguous language of the MSA compels arbitration, it is unnecessary for the Court to characterize the arbitration clause as broad or narrow. Under the operative language of the MSA, the arbitration provision unambiguously requires arbitration because it is a dispute that "arises out of or relates to" the independent auditor's calculation and determination of the MSA payments and because it is a dispute "concerning the operation or application of any of the adjustments . . . and allocations described in subsection IX(j)."

### iv. Meaning of "Arise out of" or "Relate to"

The State complains that appellees are attempting to transform the arbitration clause into a massive exception to the court's exclusive jurisdiction that "swallow[s]" the MSA's court jurisdiction "virtually whole, rendering that jurisdiction largely illusory." Specifically, the State argues that, in order for this Court to comport with Maryland principles of contract interpretation, we must not construe the phrases so as to render meaningless or illusory other provisions of the MSA. The State points to precedent, in a variety of legal contexts, for the imposition of "substantive, common sense limits on the potentially infinite phrases 'arising out of' and 'relate to.'"

In discussing *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), the State cautions this Court to heed the Supreme Court's observation that "if 'relate to'" as used in the federal ERISA statute "were taken to the furthest stretch of its indeterminancy, then for all practical purposes preemption would never run its course, for 'really, universally, relations stop nowhere.'" *Id.* at 655, 115 S.Ct. 1671 (citing H. James, Roderick Hudson xli (New York ed., World's Classic 1980)). Our interpretation of the arbitration provision, however, does not construe "relate to" to the "furthest stretch of its indeterminacy" because the clause applies specifically to the instant dispute. *See supra* Part I.A.ii.

Expounding on its contention that we must apply common sense, substantive limits on the arbitration phrase, the State points to *Beale v. American Nat'l Lawyers Ins. Reciprocal,* 379 Md. 643, 843 A.2d 78 (2004). *Beale,* however, is inapposite because the contractual language limited the insurance carriers' liability to damages "arising out of the same, related or continuing Professional Services." *Id.* at 645, 843 A.2d 78. Because there was no dispute that all five clients' malpractice claims arose out of "Professional Services," the issue was whether the professional services received by the clients were the "same" or "related." The Court of Appeals noted that the term "relate" implied a "logical or causal connection." *Id.* at 654, 843 A.2d 78. Not only is our interpretation of the arbitration clause logical, but the plain language of the clause clearly encompasses the issue of diligent enforcement for the purposes of a NPM Adjustment. Our reading of the arbitration provision does not render meaningless or illusory the enforcement clause or any other provisions of the MSA.[15]

The State also suggests that the arbitration clause is limited to an "appellate"—type review of disputes concerning calculations or determinations that "have been made" by the independent auditor. Section XI(c), however, is not limited to determinations "actually committed to" or "actually made by" the independent auditor because the meaning of the phrase "determinations made" encompasses determinations that "have been made," "are made" and are "to be made." *See, e.g., County of Los Angeles v. Shalala,* 192 F.3d 1005, 1013 (D.C.Cir.1999) (opining that the phrase "payments made" does not convey a single meaning, but includes payments that have been made as well as payments to be made).

---

**15.** There are other areas under the MSA that are subject to the circuit court's exclusive jurisdiction. In other jurisdictions, a wide range of disputes over the MSA's marketing and other restrictions have been litigated and resolved through enforcement actions in MSA courts. *See, e.g., People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.,* 116 Cal.App.4th 1253, 11 Cal.Rptr.3d 317 (2004); *State ex rel. Goddard v. R.J. Reynolds Tobacco Co.,* 206 Ariz. 117, 75 P.3d 1075 (2003).

Accordingly, arbitration is required regardless of whether the independent auditor actually determined whether a state has "diligently enforced" its qualifying legislation. *See Massachusetts*, 864 N.E.2d at 513 ("Whether the Auditor made this determination explicitly, impliedly, or by employing a presumption makes no difference."); *Connecticut*, 905 A.2d at 53 (holding that the arbitration provision "does not contain the limitation urged on us by the state, that only disputes over determinations or calculations 'actually committed to, and actually made by, the Independent Auditor in the first instance' are arbitrable"); *New Hampshire*, 927 A.2d at 510 (arbitration clause includes "disputes over issues not actually determined, just as well as those over issues which are actually determined").

Even if we were to adopt the State's proposed reading of § XI(c), that arbitration is limited to determinations "that have already occurred" by the auditor, the dispute is still arbitrable. Because there was a six percent "Market Share Loss" and the MSA was a "significant factor" of that loss, § IX(d)(1)'s requirements for a NPM Adjustment were satisfied. Given the fact that all settling states had a qualifying statute, the only way that the auditor could have denied the NPM adjustment for the 2003 calendar year was by finding that the states diligently enforced their statutes. *See Massachusetts*, 864 N.E.2d at 513 (holding that "the only means by which the auditor could have denied the NPM Adjustment for that year was by affirmatively finding that there was diligent enforcement by the States. It is therefore logically necessary to assume that the auditor did make a diligent enforcement determination"); *New Hampshire*, 927 A.2d at 510 ("Auditor did, in fact, make a determination regarding diligent enforcement.").

Accordingly, there is no language in the arbitration clause or the MSA that narrows or creates exceptions to the substantive scope of § XI(c) as written or establishes conditions precedent to invoking the right to arbitrate.

### B. Structure of the MSA Requires Arbitration

Although this Court is satisfied that the plain language of the MSA requires arbitration, there are additional factors that support our determination.

#### i. Need for uniformity

The State contends that "[a] nationwide arbitration concerning the diligence of [fifty-two] states and territories in enforcing their own laws might well represent the ultimate in 'chaos.'"

The State, however, cannot explain how a proceeding that is subject to one final and binding determination would be less workable or expeditious than litigating the issue fifty-two times in fifty-two separate court systems with the imminent possibility of delays and appeals.

The MSA's payment structure is nationwide and unitary. The independent auditor calculates and determines the participating manufacturers' annual payments and then allocates those funds among the settling states. In the case of diligent enforcement, a single decision-maker is vitally important because the determination for one state affects every other settling state pursuant to § IX(d)(2)(C)'s "reallocation" provision.

The question of diligent enforcement cannot be made in a vacuum. We concur with the numerous jurisdictions that have held that the present dispute must be resolved under one clear set of rules that apply with equal force to every settling state. We find the rationale of the Superior Court of Connecticut particularly compelling:

> The problem is even more acute, however, when the resolution of a dispute as to calculations and determinations by the Independent Auditor will necessarily have different effects on different Settling States. Unless such disputes are presented to and decided by tribunals that have the power to hear from and bind each affected Settling State as a party, great mischief can be done and substantial unfairness can result. Where, for example, as in this case, it is

claimed that an individual Settling State is exempt from the NPM Adjustment for a given year because it diligently enforced a Model Statute that was in full force and effect throughout that year, the decision of the tribunal deciding that issue will not only affect the interests of the Settling State seeking to qualify for the exemption, but those of all other Settling States as well. This is so because the granting of an exemption to one Settling State will inexorably lead to the reallocation of its allocated portion of the NPM Adjustment to all other non-exempt Settling States. Each Settling State thus has a vital interest in the granting or denial of each other Settling State's individual claim for exemption, and for obvious reasons, their interests are conflicting. Submitting such a dispute to a neutral panel of competent arbitrators affords all interested parties the right to be heard on a level playing field where no interested party enjoys an apparent home-field advantage.

*Connecticut v. Philip Morris, Inc.*, 279 Conn. 785, 905 A.2d 42, 50–51 (2006), *aff'g* 2005 WL 2081763, *39 (Conn.Super.2005) (The Supreme Court of Connecticut affirmed the unreported superior court opinion and opined, "Indeed, the trial court aptly stated that, if the interpretation of the rules on calculating annual payments were left up to the courts of each of the settling states, 'fifty-two different sets of payment rules might emerge, sowing confusion, depriving [s]ettling [s]tates of mon[eys] needed for smoking cessation and other essential health programs, and causing wave after costly wave of new litigation.' " The compelling and persuasive analysis of the superior court has been quoted in both unreported and reported decisions in other jurisdictions.).

## ii. Presumption in Favor of Arbitration

Appellees argue that, even if there had been a question as to arbitrability, any "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), and "should not be denied unless it may be said with positive assurance that the

arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *see Walther v. Sovereign Bank,* 386 Md. 412, 424–25, 872 A.2d 735 (2005) (Maryland also recognizes a strong policy favoring arbitration, consistent with the approach taken by the Federal Arbitration Act.); *Redemptorists v. Coulthard Servs., Inc.,* 145 Md.App. 116, 150–51, 801 A.2d 1104 (2002) ("A court must resolve any doubts concerning the scope of arbitrable issues in favor of arbitration, reflecting a strong public policy in favor of arbitration," but must be careful not to "require a party to submit a dispute to arbitration that it has not agreed to arbitrate.").

The State contends, however, that before we can apply the presumption in favor of arbitration, we must first make a threshold determination as to whether XI(c) is "broad" or "narrow." As we have previously explained, this determination is not necessary because the question of diligent enforcement falls within the purview of XI(c) and, thus, the plain language of the section compels arbitration. *See Simon v. Pfizer,* 398 F.3d 765, 775 (2005); *McDonnell Douglas Fin. Corp. v. Penn. Power & Light Co.,* 858 F.2d 825, 832 (2d Cir.1988) ("when an arbitration clause by its terms extends only to a specific type of dispute, then a court cannot require arbitration on claims that are not included").

If, however, as appellees suggest, the clause is broad and there remains a question as to arbitrability, the State faces a near insurmountable hurdle overcoming the presumption of arbitration given the fact that courts from forty-five jurisdictions have rendered the clause susceptible of an interpretation requiring arbitration. The State attempts to seek refuge from this overwhelming and uniform authority with several unavailing arguments. First, the State insists that we should disregard the decisions because they do not apply to Maryland law. The touchstones of contract law, notably that the plain language of the contract governs and that contracts must be considered in their entirety, are the same principles of law that apply in the other forty-four jurisdictions. The State also

suggests that the decisions lack value because they were issued "in very rapid succession" and, thus, constitute a "snowball phenomenon." The State also argues that the opinions provide only a cursory review of the dispute *sub judice.* Contrary to the State's assertion, the decisions, which were issued over the last year and a half, thoroughly analyze the language and structure of the MSA. Ironically, the lone Louisiana decision, denying the participating manufacturer's motion to compel arbitration consists of one conclusory paragraph. The State is therefore unable to demonstrate with any degree of certitude that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. *See AT & T Technologies, Inc.,* 475 U.S. at 650, 106 S.Ct. 1415.

## II

### The 2003 Settlement Agreements with the original participating manufacturers

■ In its second argument, the State contends that, with respect to the original participating manufacturers, a series of 2003 June Settlement Agreements settled the present dispute.[16] Having already been resolved, the State argues that the present dispute is not arbitrable. The State additionally contends that, because the 2003 Agreements do not contain an arbitration clause, an arbitration panel does not have the authority to determine the scope and effect of those 2003 Agreements.

In 2003, each of the original participating tobacco manufacturers entered into a series of additional settlement agreements with the State. Specifically, the Agreements provide that the tobacco manufacturer "absolutely releases and forever discharges [the State of Maryland] from any and all monetary claims that it ever had, now has, or hereafter can, shall or may have under Section IX(d) of the MSA ['Non–Participating

---

16. The State does not claim that the subsequent participating manufacturers have waived or released claims to a 2003 NPM Adjustment in the 2003 Settlement Agreements. Accordingly, we address the issue only as it pertains to the original participating manufacturers.

Manufacturer Adjustment'] with respect to Cigarettes shipped or sold in 1999, 2000, 2001 and 2002, including any effect such monetary claims may have on future payments under the MSA."

Expounding upon its argument that the present dispute is not arbitrable, the State points to Maryland*s NPM escrow statute, which sets forth that non-participating manufacturers must pay a specified amount into escrow for each cigarette sold in Maryland "by April 15 of the year following the year in question. . . ." Escrow Act § 3(a)(2). Thus, the State contends that it could undertake no enforcement activities with respect to cigarettes sold in 2003 until April 16, 2004. Elaborating, the State argues that "all enforcement activity during the calendar year 2003 could not have been with respect to cigarettes sold in 2003 . . . and would necessarily have been with respect to Cigarettes shipped or sold in 1999, 2000, 2001, and 2002."

The original participating manufacturers question whether the June 2003 Agreements apply to the present dispute, arguing that a participating manufacturer's NPM Adjustment for a particular year is based upon cigarettes sold in that year. The Agreements expressly limit the release of claims under § IX(d) with respect to cigarettes sold or shipped from 1999 to 2002. Consequently, to the original participating manufacturers, the only claim an original participating manufacturer has under § IX(d) is for a NPM Adjustment and an original participating manufacturer's NPM Adjustment for a particular year is based on the cigarettes shipped or sold in that year and, thus, the language of the 2003 Agreements simply release a claim for a NPM Adjustment with respect to those four years.

It is unnecessary, however, to determine whether the NPM Adjustment is based upon sales from 2002 or 2003 because paragraph 8 of the 2003 Agreements expressly acknowledge that there continues to be a dispute "[w]ith respect to potential NPM Adjustments relating to Cigarettes shipped or sold in 2003 and subsequent years." Therefore, paragraph 8 re-

serves the original participating manufacturers' right to seek a NPM Adjustment for the year 2003.

Moreover, the original participating manufacturers contend that the State's "waiver" defense is not a freestanding issue that can be decided apart from the MSA. Specifically, they argue that diligent enforcement through execution of the June 2003 Agreements is arbitrable because disputes concerning the applicability of a diligent enforcement exemption fall within the plain language of the MSA's arbitration clause. Thus, they contend that it is irrelevant that the June 2003 Agreements do not contain an arbitration clause because "[w]hat is dispositive is that the dispute in which those agreements are being asserted as a defense is arbitrable." *See New Hampshire*, 927 A.2d at 512.

Concurring with the other jurisdictions, we agree with the original manufacturers' assertion. *See New Hampshire*, 927 A.2d at 512; *see also Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) ("[T]he presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability.'"); *Niro v. Fearn International, Inc.*, 827 F.2d 173, 175 (7th Cir.1987) ("[A] settlement agreement is an arbitrable subject when the underlying dispute is arbitrable, except in circumstances where the parties expressly exclude the settlement from being arbitrated.").

The dispute over whether the June 2003 Agreements prohibit the original manufacturers from contesting diligent enforcement in 2003 falls within the purview of the auditor's determination concerning the applicability of the NPM Adjustment and, therefore, must be presented as part of the arbitration process.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**