957 A.2d 173

**Arthur LONG**

v.

**John BURSON, et al.**

**No. 1521, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Sept. 16, 2008.

2

**4**

Edward Amourgis (Edwards Phillip, PC on the brief), Rockville, for Appellant.

Tracey L. Perrick (Roy I. Niedermayer, Paley, Rothman, Goldstein, Rosenberg, Eig & Cooper, Chtd. on the brief), Bethesda, for Appellee.

Panel: DEBORAH S. EYLER, SALLY D. ADKINS,* PAUL A. HACKNER (Specially Assigned), JJ.

HACKNER, Judge.

Appellant, Arthur Long ("Long" or "appellant"), appeals two orders of the Circuit Court for Prince George's County awarding appellees,[1] Ivor and Elmarine Elphage ("the Elphages") foreclosure proceeds from the sale of real property in the amount of $114,969.87 and costs and attorneys' fees totaling $37,497.98. On appeal, Long presents three questions for our review, which we have slightly rephrased:

1. Did the circuit court err in awarding the Elphages $114,969.87 of the foreclosure surplus proceeds?

2. Did the circuit court err in failing to consider Long's claims of breach of contract, conversion, trespass, punitive damages, and attorneys' fees?

3. Did the circuit court abuse its discretion in granting the Elphages attorneys' fees?

---

* Judge Adkins, now serving on the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; she participated in the adoption of this opinion as a specially assigned member of this Court.

1. John Burson is the trustee for Bank of America, the foreclosing bank, and is no longer an interested party to the appeal.

For the following reasons, we shall vacate the judgments of the circuit court and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

This appeal constitutes the third chapter in the continuing saga of the parties' dispute regarding their interests in real property located at 1305 Chillum Road, Hyattsville, Maryland ("the Property"). Long and the Elphages have been before this Court twice before on issues stemming from a somewhat convoluted transaction for the sale of the Property via a land installment contract ("the Contract").[2] This Court outlined the nature and the history of the transaction in *Long v. Elphage*, No. 2064, September Term 2005, slip. op., 171 Md. App. 741 (filed Oct. 12, 2006) (*"Long I "*).

### The Contract

On July 29, 1997, the Elphages entered into a land installment contract with the original signatories, Harrison and Margaret Long ("the Longs"). In 2003, the Longs assigned the Contract to Long.[3] Prior to the Contract, the Elphages had executed a Deed of Trust to secure a loan for their original acquisition of the Property. The balance owed by the Elphages on the Deed of Trust when they entered into the Contract with the Longs was $129,201.67. The Contract recited a total sale price of $169,201.67 and provided that the Longs would make an initial payment of $40,000 in the form of a transfer of real property owned by the Longs in Virginia. The remaining $129,201.67 was to be paid in monthly installments in amounts that would exactly track the monthly payments that the Elphages were required to pay to their lender under the terms of their Deed of Trust.

In *Long I* this Court noted Mrs. Elphage's testimony during the original trial, that the Longs were unable to obtain the

---

2. As we discuss *infra* in further detail, those cases were *Long I* (filed Oct. 12, 2006) and *Long v. Elphage*, No. 279, September Term 2007, slip. op., 178 Md.App. 749 (filed Jan. 28, 2008) (*"Long II "*).

3. Long is Harrison Long's brother.

funds to purchase the Property outright. Therefore, the Elphages agreed to finance the sale by way of a land install- ment contract. The Contract required the Longs to transfer a parcel of property they owned in Virginia to the Elphages making up a $40,000 deposit on the purchase price. In addition, the Longs assumed responsibility for the monthly mortgage, escrow payments, property taxes, and for maintain- ing the Property as required by the Elphages' Deed of Trust. However, the Longs were to make those payments to the Elphages rather than the note holder.

Paragraph two of the Contract, entitled "Installment Pay- ments," provides that the balance of the purchase price owed by the Longs equaled the balance that the Elphages owed their lender under the Deed of Trust note. The paragraph begins by reciting the existence of the Deed of Trust which required the Elphages to pay monthly installments to their lender "in constant and level monthly installments of $1,029.02 each," which included payment on the principal of the loan as well as mandatory "mortgage insurance, real estate taxes, and hazard insurance." [4] Paragraph two also explained that the Elphages' monthly payment on the Deed of Trust "changes from time to time because of changes in the amount of real estate taxes and hazard insurance premiums." It listed the following payment schedule that the Elphages were required to follow under the Deed of Trust, exclusive of real estate taxes and hazard insurance:

| July 1, 1997 through July 1, 2003 | $1,066.51 |
| August 1, 2003 through July 1, 2023 | $1,056.58 |
| August 1, 2023 through June 1, 2024 | $1,029.02 |
| July 1, 2024 | $1,022.16. |

Having described the Elphages' payment obligations under the Deed of Trust in Paragraph two, Paragraph four then establishes Long's payment obligation to the Elphages. That paragraph, entitled "Application of Provisions of Deed of Trust to Purchaser", incorporated, in pertinent part, the pay-

---

**4.** Paragraph two also noted that the Deed of Trust "bears interest at the rate of 8.625% per annum, [and] is due and payable in full on July 1, 2024."

ment provisions from the Deed of Trust into the Contract. Specifically, paragraph four provided that "Purchaser [Long] shall comply with, assume, perform, and owe Seller [the Elphages] the duties and obligations described in such paragraphs as though those paragraphs had the substitution of the following terms: (i) "Seller" for "Lender," (ii) "Purchaser" for "Borrower," and (iii) "Installment Land Contract between Seller and Purchaser." " Paragraph thirteen of the Contract accordingly stipulated that Long's monthly payment due on the first of each month was $1029.02 "exclusive of hazard insurance, real estate taxes, [and] mortgage insurance."

Paragraph three of the Contract gave the Elphages, upon default of any of the provisions of the Contract:

the right to accelerate all remaining payments and require [Long] to pay immediately the full amount of the then-remaining balance of principal and outstanding interest and other charges of the Deed of Trust which have not been paid plus all costs and expenses incurred by [the Elphages] in enforcing this contract to the extent not prohibited by applicable law, including reasonable attorneys' fees.

The Contract also provided that when 40% of the balance was paid off, the Elphages would deed the Property to the Longs.

### The Elphages' Declaratory Judgment and Breach of Contract Action

In 2002, the Elphages brought a declaratory judgment and breach of contract action in the Circuit Court for Prince George's County against the Longs, alleging that the Longs had breached the Contract by failing to pay monthly installments and failing to maintain the Property. The Elphages also sought a declaration that the assignment of the Contract from Harrison and Margaret Long to appellant was void. Although instituted in 2002, the Elphages' declaratory judgment action has run parallel to the foreclosure proceedings in the instant case but was not consolidated therein. As we noted above, the declaratory judgment action has been the subject of two prior appeals before this Court. To give consistency and clarity to the issues before us in the instant

case, we excerpt relevant facts and procedural history surrounding the declaratory judgment action from our opinion in *Long I:*

> The Elphages sought a declaration that the Longs were in default and no longer had any rights under the [C]ontract; that they (the Elphages) had the right to repossess the [P]roperty; and that they "shall have the right to foreclose on [the Longs'] equity of redemption by judicial sale." The Elphages asked the court to enter an order requiring the Longs to release their rights to the [P]roperty and to execute documents conveying to them any interest the Longs had in the [P]roperty. Finally, the Elphages sought compensatory damages and attorneys' fees as "alternative relief."

> * * *

> Sometime later in 2004, the [Elphages] learned that the [C]ontract had been assigned to [ ] Long. On January 21, 2005, they filed a second amended complaint that added [ ] Long as a defendant and also added a count seeking a declaration that the assignment of the Contract was procured by fraud and was ineffective. The Elphages amended their prayer for relief to request, *inter alia,* that the court determine that [ ] Long had no legal or equitable interest in the [P]roperty "or, in the alternative," that they (the Elphages) had the right to bring a foreclosure action against him. They increased their compensatory damages request to $500,000.

> * * *

> A bench trial took place on July 27, 2005.... The witnesses who testified about facts relevant to this appeal were Mrs. Elphage and [ ] Long (who was representing himself).

> * * *

> [Mrs. Elphage testified that] in January 2005, [ ] Long failed to make any payment to the Elphages. In February 2005, he made a monthly payment that Mrs. Elphage credit-

ed as the January 2005 payment. Although the Elphages' attorney sent a letter to [ ] Long, on February 14, 2005, informing him that he should make payments on the [P]roperty to Mrs. Elphage, who would accept them, [ ] Long did not do so. Nor did he respond to the "Notice of Default" letters of May 16, 2005, and June 15, 2005. Thus, by the time of trial, payments under the [C]ontract were six months in arrears (February through July 2005). As a consequence, Mrs. Elphage had to withdraw money from her IRA account and borrow money from her sister-in-law in order to make the monthly payments on the Property. In total, she and Mr. Elphage had had to pay $8,895 to avoid foreclosure.

\* \* \*

On August 12, 2005, the trial court issued a written declaration of rights finding, *inter alia,* that [ ] Long had defaulted under the [C]ontract by failing to make monthly payments after January 2005; that the default made the [C]ontract unenforceable and void; that [ ] Long no longer had any legal or equitable interest in the [P]roperty; and that the Elphages were now the fee simple owners of the [P]roperty, free and clear of the [C]ontract. The court declined to award the Elphages any compensatory damages [or attorneys' fees].

*Long I,* slip op. at 2–8.

Both Long and the Elphages appealed the judgment of the circuit court to this Court. *Id.* at 1–2. Long challenged that portion of the circuit court's ruling divesting him of any rights in the Property. *Id.* at 9. The Elphages cross-appealed on the subject of attorneys' fees. *Id.* at 1. In an opinion issued October 12, 2006, we vacated and remanded the judgment of the circuit court. *Id.* at 13. In doing so, we held that the Elphages could not legally repossess the Property through a declaratory judgment action. *Id.* at 11. We explained that Maryland law viewed a land installment contract as a form of a lien instrument whereby the seller in retaining legal title to the subject property maintained a "security interest" in the

property to ensure the enforcement of the contract obligations. *Id.* at 9–10. Upon entering into the land installment contract, however, equitable title immediately passed to the buyer, in this case Long. *Id.* at 9, 12. We then explained that the Maryland Rules stipulated that the only means of enforcing a land installment contract was through foreclosure proceedings, emphasizing that "[p]lainly, a seller who seeks to repossess from the purchaser [of] property sold under a land installment contract only may do so by a foreclosure action." *Id.* at 10–11. We further noted: "[T]he purpose of this procedure is to provide a mechanism whereby a purchaser would not lose the equity and interest he had built in his home in the event of a default." *Id.* at 11 (internal citation, quotation and alteration omitted) (Emphasis added).

Accordingly, we concluded that to "obtain any interest greater than a security interest" under the Contract, the Elphages were required to institute foreclosure proceedings against Long. *Id.* at 12. Therefore we vacated that portion of circuit court's ruling declaring the Contract void and that Long no longer had "any legal or equitable interest" in the Property, and declaring that the Elphages were the sole owners of the Property. *Id.* at 13. We also observed that, "[a]s our decision with respect to [ ] Long's appeal has rendered the Elphages' cross-appeal moot, we need not address it." *Id.* at 13. Thus, we remanded the case to the circuit court for "an entry of a revised declaratory decree" consistent with our opinion.[5]

### Foreclosure

In the meantime, on May 1, 2006, the Bank of America, holder of the Deed of Trust note, instituted foreclosure pro-

---

5. On remand, the circuit court once again declared that "Ivor C. Elphage and Elmarine Elphage are the owners in fee simple of the real property" at issue. *Long II,* slip. op. at 3. Long once again appealed that decision to this Court. *Id.* The Elphages however, in a letter to this Court "recognize[d] that the 'revised' declaration is facially incorrect" and stated that they did not oppose the relief sought by Long's appeal. *Id.* Accordingly, we once again vacated the judgment of the circuit court and remanded for further proceedings, "so that the declaration may be properly revised." *Id.* at 4.

ceedings on the Property. Following a foreclosure sale of the Property, after the bank had been paid in full, there were surplus proceeds totaling $233,195.93. As the equitable owner of the Property, Long filed a Petition for Surplus Proceeds from the Property, which the auditor granted. The Elphages subsequently filed an Application for Payment of Surplus Proceeds and Objections to Ratification of Auditor's Report and Objection to Petition for Payment of Surplus Proceeds by [ ] Long, claiming that they should be awarded $114,969.87 to satisfy the outstanding balance that Long still owed them on the Contract. Long filed a reply, claiming that the Elphages were seeking a double recovery on the Contract, as the debt owed on the Contract had been satisfied by the proceeds of the foreclosure sale. Long also filed a motion seeking "damages and attorneys' fees" resulting from "the Elphages' improper conduct in evicting Long from [the Property] in August 2005 through self-help means and waste."

A hearing was held on April 5, 2007. At the hearing, the Elphages argued that the references to the Deed of Trust in the Contract merely functioned as notice of the debt's existence. They asserted that because Long "[k]nowingly and voluntarily assumed the risk of non-payment when he entered into the land installment contract," he was estopped from claiming the Contract as a defense to the Elphages' debt claim. Finally, the Elphages claimed that Long's failure to make monthly payments under the Contract was the actual cause of the foreclosure proceedings in the instant case as the Elphages could not afford the payments on the Deed of Trust. Thus, the Elphages concluded, because Long had "unclean hands" he was not entitled to surplus proceeds because his actions had caused the foreclosure action in the first place.

Long countered that "through his equity in the [P]roperty through this foreclosure process, [he] has in fact paid off the Elphages['] [D]eed of [T]rust," and that he was entitled to set-off and subrogation. Long also asserted a damages claim for ejectment. Long abandoned the claim, however, upon questioning from the court as to how he intended to prove damages.

At the close of argument, the circuit court granted the Elphages' motion, awarding them $114,969.87 from the foreclosure proceeds.[6] At that hearing, the Elphages also moved for attorneys' fees pursuant to a provision in the Contract allowing for "reasonable attorneys' fees" accrued in the enforcement of the Contract. The court indicated that it would entertain that motion at a later date and gave the Elphages leave to submit their request in writing along with any supporting materials.

On April 24, 2007, the Elphages filed a Motion for Attorneys' Fees with the court. In support of their motion, the Elphages submitted an affidavit from Roy I. Niedermayer, counsel to the Elphages, as well as hourly billing records and a list of expenses. A hearing was held on the attorneys' fees motion on July 11, 2007. At the hearing, the Elphages submitted a list of "Professional Services" listing the type of services their lawyers had provided, the lawyer performing the service, the date the services was provided, as well as the time spent. The Elphages also submitted a list of expenses they accrued from 2005 through 2007. Additionally, Roy Niedermayer, the Elphages' lead counsel, testified as to the work involved in the Elphages' case, as well as the reasonableness of the fees assessed, as detailed in the Elphages' exhibits. In total the Elphages requested $37,497.98 for attorneys' fees [7] that they had accumulated in various proceedings against Long to enforce the Contract since 2005. At the end of the hearing, the circuit court awarded them precisely that amount. An order was issued reflecting the court's ruling on August 20, 2007. This timely appeal followed.

---

**6.** The court initially awarded the Elphages the entirety of the foreclosure proceedings. Upon clarification from the Elphages, however, the court amended its award to $114,969.87. An order reflecting that amount was entered into on April 5, 2007.

**7.** In their Motion For Attorneys' Fees, the Elphages originally requested "32,452.53 for legal fees incurred from January 2003 through October 2005" and "$7,061.95 for legal fees incurred from January 2007 through the present" for reasonable attorneys' fees incurred in the surplus action.

Further facts and details of the proceedings will be described throughout this opinion as may be necessary for our discussion.

## DISCUSSION

### I.

### Did the circuit court err in awarding the Elphages $114,969.87 of the foreclosure surplus proceeds?

 Long asserts that the circuit court erred in awarding $114,969.87 of the foreclosure proceeds to the Elphages because its ruling is based on the incorrect premise that the Contract created a separate debt owed by Long to the Elphages distinct from that the Elphages owed to the bank on the Deed of Trust.[8] Long argues that the court's interpreta-

---

8. Long also argues that the circuit court's decision "contradicts and varies the final unreported decision of October 12, 2006 of this Court [*Long I*] which dealt with the rights of the parties under the [C]ontract." Long maintains that the circuit court's ruling "contradicts the 'law of the case.'" In support of his contention, Long draws our attention to the facts and proceedings section of *Long I* where we noted that the Elphages had entered into a land installment contract with the Longs, and commented that the balances on both the Contract and the deed of trust were precisely equal. Long then observes that we concluded that he held "equitable title" to the Property, while the Elphages only held legal title to secure "Long's obligations under the [C]ontract." Thus Long contends, "[t]he opinions and the facts to which such opinion are based are conclusive and final between the parties and they are 'the law of the case.'"

While we agree with *Long I's* explication of the Contract and the relationship of the parties, we are compelled to note that the holding in that case is more limited than appellant suggests. It is only the holding of the case that gives rise to the law of the case.

The law of the case is a rule of appellate procedure whereby, "[o]nce an appellate court has answered a question of law in a given case, the issue is settled for all future proceedings." *Stokes v. American Airlines*, 142 Md.App. 440, 446, 790 A.2d 699 (2002). The portions of our opinion in *Long I* that determine the ownership interests in the Property and the validity of the declaratory judgment action constitute our decisions on "questions of law" that are binding in future proceedings. *Id.* However, our recounting of the facts and proceedings before the lower court described in the factual history section of our opinion does

tion of the Contract as establishing two separate and distinct debts is contrary to the "express written terms of the [C]ontract." Specifically, Long points to paragraph four of the Contract, which stipulates that Long "would comply with, assume, perform, and owe the Elphages the duties and obligations, including payment obligations as set forth in certain paragraph of the deed of trust." He also notes that at trial, Mrs. Elphage testified that the Longs "assumed responsibility for the monthly mortgage and escrow payments . . . [which] were to be made to the Elphages." Finally, Long claims that to make it clear that the debt under the Contract and the Deed of Trust were the same, the Contract "gave the Elphages the right, upon default by [Long] . . . to accelerate all remaining payments and require [Long] to iediately [sic] pay the full amount of the remaining balance of the principal and interest under the deed of trust note." Thus Long concludes, because "Long assumed the Elphages' payment of the Deed of Trust loan, [ ] Long fulfilled his obligations under the [C]ontract when the debt secured by the foreclosed Deed of Trust was paid from the foreclosure proceeds in the present case." Therefore the Elphages have no right under the Contract to the foreclosure proceeds at issue in the instant case. Although we reach the conclusion that the circuit court erred in its award to the Elphages, we arrive at that result by a different path than the one suggested by Long.

 Our interpretation of a written contract on review is *de novo.* *State v. Philip Morris Inc.*, 179 Md.App. 140, 152, 944 A.2d 1167 (2008). "As a fundamental principle of contract construction, we seek to ascertain and effectuate the intention of the contracting parties." *Id.* We primarily look to the

not constitute our holding, but merely recites the facts for the parties' understanding. The language contained therein that Long alleges as binding is but mere dicta. As the Court of Appeals has recently reiterated, "it is clear that, in Maryland, dicta not adopted as a final determination may not serve as the binding law of the case." *Garner v. Archers Glen Partners, Inc.*, 405 Md. 43, 57, 949 A.2d 639 (2008).

Appellant also mentions *res judicata* and *collateral estoppel* in passing but did not argue the application of those doctrines to the instant case. Accordingly, we will not address those matters.

"language of the contract itself" to determine the intent of the parties. *Bennett v. Wright*, 167 Md.App. 291, 295, 892 A.2d 1164 (2006). Finally, when "ascertaining the true meaning of a contract, the contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *State v. Philip Morris*, 179 Md.App. at 152–53, 944 A.2d 1167 (internal quotation omitted).

To understand the nature of the subject transaction it is worthwhile to discuss the evolution of land installment contracts and their place among available real estate financing methods. Historically, land installment contracts were a land financing arrangement that resembled a leasing arrangement. *Spruell v. Blythe*, 215 Md. 117, 121, 137 A.2d 183 (1957). Generally entered into to circumvent government imposed rent control standards governing residential leases, land installment contracts required a minimal down payment and outlined a payment scheme of "substantial weekly or monthly payments" towards the purchase price of the property. *Id.* The buyer would take possession of the dwelling and at the end of an agreed period of time, if all the payments had been made, the seller would convey title to the buyer. *Id.* Although the buyer would make payments on the contract, his payments did not count towards equity in the property. *Id.* Consequently, if the buyer did not fulfill the conditions of the land installment contract, the seller retained the right to eject the buyer and repossess the property. *Sidhu v. Shigo*, 61 Md.App. 61, 68, 484 A.2d 1033 (1984). This process resulted in the ejected buyer being left without any equity, despite having made substantial payments toward the purchase of the property. *Id.*

The General Assembly sought to remedy such harsh results by enacting the Land Installment Contract Act of 1951 (codified as Md.Code (1974, 2003 Repl.Vol.), § 10–101 *et seq.* of the Real Property Article ("R.P.")). *Hudson v. Maryland State Housing Co.*, 207 Md. 320, 114 A.2d 421 (1955); *Russ v.*

*Barnes*, 23 Md.App. 691, 329 A.2d 767 (1974). The Land Installment Contract Act ("Act") recast the contractual relationship between buyer/purchaser and seller/vendor to be akin to a seller-financed sale. *See, e.g., R.P.,* § 10–101(b)(1) (defining a land installment contract as a financing arrangement where the "vendor agrees to sell an interest in property to the purchaser and the purchaser agrees to pay the purchase price in five or more subsequent payments exclusive of the down payment, if any[.]"); R.P. § 10–101(b)(2) (stipulating that in a land installment contract the seller/vendor only "retains title as security for the purchaser's obligation."); R.P. 10–103(d) ("No vendor may place or hold any mortgage on any property sold under a land installment contract in any amount greater than the balance due under the contract, nor may any mortgage require payments in excess of the periodic payments required under the contract.")

In a traditional seller-financed transaction, the seller conveys the property and takes back a mortgage or deed of trust securing a promissory note for the credit extended to the buyer. David A. Thompson, 4 Thompson on Real Property § 100.02 If the buyer defaults on the loan, the seller can foreclose on the deed of trust. *See id.* (comparing traditional land installment contract to mortgage and noting that unlike mortgagees, a seller in a land installment contract financing arrangement is not bound by rules governing foreclosure upon default) If there is any equity in the property remaining after the lender is paid, the buyer is entitled to its benefit. *See id.* (comparing land installment contract and mortgages and noting that "[t]he buyer, unlike the mortgagee, cannot force the sale of the property and have the proceeds applied to the debt and the excess refunded.")

Similarly, under the Act, the seller in a land installment contract holds bare legal title to the property solely as a lien to secure the balance of the contract payments. R.P. § 10–101(b)(2). As we observed in *Long I,* Maryland law considers a land installment contract a form of a lien instrument. *Long I,* slip. op. at 10 (citing Md. Rule 14–201(b)(5))

(defining a "lien instrument" to include "a land installment contract including those defined in [R.P.] § 10–101(b). . . ."). Under the Act, the buyer is considered the equitable owner of the land, entitled to use and possession and the benefit of any appreciation in the property's value. *Long I*, slip. op. at 12; *see also* R.P. § 10–102(f) (requiring seller to record the contract "among the land records of the county where the property lies and mail the recorder's receipt to the purchaser."); Md. Rule 14–201(b)(8) (defining "[r]ecord owner of property" to include "the record holder of the rights of a purchaser under a land installment contract.") If the buyer defaults under a land installment contract, the seller's remedy is to foreclose the lien rather than simply to evict the buyer and take back the property. *Hudson v. Maryland State Housing Co.*, 207 Md. 320, 114 A.2d 421 (1955); *U.S. v. Schecter*, 251 F.3d 490, 494 (4th Cir.2001). Upon foreclosure, the seller is entitled to the balance of the debt owed by the buyer and expenses called for by the contract, but the buyer does not forfeit any equity that may have accumulated in the property.[9] *Russ v. Barnes*, 23 Md.App. at 695, 329 A.2d 767.

The financing arrangement utilized by the parties in the instant case went beyond a basic land installment contract, to encompass many features commonly found in a mortgage assumption even though they did not enter into an actual assumption agreement.

 In a regular assumption transaction, the buyer executes an agreement with the lender by which the buyer assumes the seller's obligations under the original debt instruments. The buyer takes the seller's place in the underlying obligation and the lender then looks primarily to the buyer for satisfaction of the debt. *Wright v. Wagner*, 182 Md. 483, 489, 34 A.2d 441 (1943).[10] That is not what the parties provided in the Contract before this Court.

---

**9.** Equity is generally thought of as the fair value of the property less the balance of any encumbrance. BLACKS LAW DICTIONARY (8th ed.2004).

**10.** In an assumption, the buyer would have to meet the lender's credit requirements and would normally be required to pay market interest

Although the Contract states that the buyer will "assume" the seller's duties under the deed of trust, the lender was not a party to the transaction. Instead, the Contract provided that the installments to be paid by Long to the Elphages would be identical to installments that the Elphages were required to pay under the mortgage debt to their lender.[11]

As we noted in *Long II*, there were "two distinct debts, albeit in precisely the same amount, owed to two distinct creditors and secured by two distinct instruments, one a deed of trust and the other a land installment contract." Nevertheless, the express language of the Contract, including, by incorporation, most of the substantive portions of the Deed of Trust, make it clear that the parties intended the payments from Long to be passed through the Elphages to their lender. The only consideration intended to flow to the Elphages under the Contract consisted of the $40,000 down payment, via transfer of a parcel of property owned by the Longs and the ultimate retirement of the Elphages' loan with Bank of America. Although the Contract recited the existence of the Deed of Trust, the Contract did not require Long to pay the contract price *plus* the balance of the deed of trust loan.

The land installment Contract created a lien against the Property to secure the unpaid portion of the sales price, which was equal to the balance owed by the Elphages to their lender. By analogy to a seller-financed transaction, the credit extended by the Elphages to Long would consist of the

---

rates. Thompson, 4 Thompson on Real Property § 101.05(a)(2) (noting that a mortgagee can impose "reasonable restrictions" on the alienation of mortgages including refinancing at current market rates). Under a land installment contract, the buyer needs only to satisfy the seller that he is creditworthy. *See* R.P. § 10–101 (noting that parties to a land installment contract are the buyer of the property and the seller of the property). In the instant case, the buyer was obligated to pay the same installments that the sellers were required to pay their lender, at the interest rate established by the deed of trust note three years earlier. (E.78)

11. The original lender was PNC Mortgage Corp. of America. (E.78) By the time of the subject litigation, the note holder was the Bank of America. *Long II*, slip op. at 5.

portion of the deed of trust obligation that the Elphages were to pay each month. *See* 4 *Thompson on Real Property* § 100.02 (David A. Thomas ed., 2004).

After Long defaulted under the Contract, the Elphages made a number of payments to their lender for which they did not receive an equivalent amount from Long. Specifically, as we noted in *Long I*, Mrs. Elphage testified:

> [B]y the time of trial, payments under the [C]ontract were six months in arrears (February through July 2005). As a consequence, Mrs. Elphage had to withdraw money from her IRA account and borrow money from her sister-in-law in order to make the monthly payments on the Property. In total, she and Mr. Elphage had to pay $8,895 to avoid foreclosure.

*Long I*, slip. op. at 7. To that extent, the Elphages disbursed monies against the credit that they had extended to Long. However, the Elphages did not pay off the entire balance of the deed of trust loan. In fact, the entire unpaid balance as well as all of the fees, costs and commissions associated with the foreclosure were satisfied out of the equity owned by Long in the Property. The only deficit experienced by the Elphages as a result of Long's default is the difference between what they paid their lender and what Long paid them.[12]

The trial court's award of $114,969.87 to the Elphages has the effect of paying them the entire contract price even though Long satisfied their debt to Bank of America from the equity in his Property. The Contract did not contemplate such a windfall. As stated above, the Contract provided that the Elphages would receive nothing more than the $40,000 down payment and retirement of their Deed of Trust debt.

Therefore, the Elphages are, at most, entitled to the amount that they paid to the lender as a result of Long's default plus

---

12. As we explain *infra,* pursuant to paragraph 3 of the Contract, allowing for, upon default, "[p]urchaser to pay ... all costs and expenses incurred by Seller in enforcing this contract ... including reasonable attorneys' fees" the Elphages may also be entitled to costs and attorneys' fees.

costs and reasonable attorneys' fees in enforcing the Contract, as provided by paragraph three of the Contract.[13] Accordingly we shall vacate the circuit court's judgment and remand for the court to determine the payments made by the Elphages that were not reimbursed by Long.

## II.

### Did the circuit court err in failing to consider Long's claims of breach of contract, conversion, trespass, punitive damages, and attorneys' fees?

Long argues that the circuit court erred at the April 5, 2007 hearing when it failed to allow Long to prove claims for breach of contract, conversion, trespass, punitive damages, and attorneys' fees. Upon review of the record, however, we conclude that Long has not preserved that issue for appeal to this Court.

At the April 5, 2007 hearing before the circuit court, Long raised claims for damages resulting from what he contended was an improper "self-help eviction" by the Elphages. Specifically, Long's counsel stated to the court: "So we're also claiming damages that we'd like to seek against the Elphages. Between the fair market value and the liquidation price as well as the damages that result of the self-help eviction." The following relevant colloquy between Long's counsel and the court then ensued:

THE COURT: How are you proving that?

[COUNSEL FOR LONG]: I'm sorry, how am I proving?

THE COURT: The damages.

[COUNSEL FOR LONG]: The damages we can—well, we would be proving the fair market value because—

THE COURT: How [are] you, how [are] you proving that?

[COUNSEL FOR LONG]: The, the—

THE COURT: How are you proving that? Today, we're dealing with the surplus and you're telling me you[ ]—have

---

13. See our discussion on attorneys' fees, *infra*.

a claim and you want me to adjudicate that claim for damages as to the self-help eviction and the (indiscernible) the loss of value for some period of time, but how are you, how are you going to prove that today?

THE COURT: If you don't have damages to prove, there's no need to argue that.

[COUNSEL FOR LONG]: No, Your Honor. **The only thing that we're seeking then, is, is that the Elphages are not entitled to their claim because of the right of set-off and subrogation.**

(Emphasis added)

Because Long conceded at the April 5, 2007 hearing that all he was arguing for was Long's entitlement to all of the surplus proceeds, any other claims were abandoned. See Md. Rule 8–131(a); *Montgomery County Council v. Leizman,* 268 Md. 621, 631, 303 A.2d 374 (1973) ("We shall not undertake a review of this aspect of the case because the appellees have not discussed it in their brief and at argument counsel stated unequivocally that it had been abandoned."). Accordingly, we conclude that the circuit court did not err in denying Long's claims.[14]

### III.

### Did the circuit court abuse its discretion in granting the Elphages attorneys' fees?

At the hearing below, after the circuit court awarded them $114,969.87 from the foreclosure proceeds, the Elphages moved for attorneys' fees pursuant to Paragraph three of the Contract allowing for "reasonable attorneys' fees" accrued in the enforcement of the Contract. The Elphages requested attorneys' fees for two periods of time: "January 2003 through

---

14. By finding that Long did not preserve the issue for appeal, we intimate no opinion as to whether he would be precluded from litigating these claims in a proper forum. Although the question is not before us, it may be questionable whether the *in personam* claims alleged by appellant in the circuit court can be litigated in an *in rem* action for distribution of foreclosure proceeds.

October 2005," for the declaratory judgment and breach of contract action and "January 2007 through the present," for the foreclosure surplus proceedings. At a hearing held on July 11, 2007, the circuit court granted the motion, awarding the Elphages $37,497.98 for attorneys' fees that they had incurred in various proceedings to enforce the Contract since 2005. In awarding the Elphages attorneys' fees, the circuit court ruled:

> I see no reasonable, legal, or equitable reason why the [c]ourt should not award the attorneys' fees as requested. I've heard arguments, I've taken the arguments into consideration. I believe the $37,497.98 is fair and reasonable based upon the testimony I've heard and based upon what has gone on in this case. And I've read the Court of Special Appeals decision, and it—apparently the amount of work that was put into this case.

> And I know the question was continuing to be asked as to whether or not the fees were reasonable in light of a basic foreclosure case, but there has not been anything based [sic] . . . case involving the parties in this case or in these proceedings. This is not a regular run-of-the-mill breach of contract declaratory judgment, nor foreclosure case.

> [T]he [c]ourt will in fact award to the Elphages the amount of $37,497.98.

Long argues that the circuit court's award of attorneys' fees for 2003 through 2007 was an abuse of discretion because it was based on insufficient evidence, as the attorney time sheets submitted into evidence did not include time records from "January 2003 to January 2006." Furthermore, Long asserts, the award of attorneys' fees for Elphages' declaratory judgment action was not reasonable because the Elphages were unsuccessful in their claim.[15]

---

15. Long concedes that the Elphages would be entitled to reasonable attorneys' fees in connection with the foreclosure action if the trial court's order in that matter is affirmed.

 In reply, the Elphages contend that the trial court's award of attorneys' fees was based on "competent and material evidence in the form of a Statement of Services, an affidavit from [Niedermayer] ... and testimony by [Niedermayer] at the hearing." Accordingly, the Elphages conclude, the circuit court's award was reasonable. We disagree for the following reasons.[16]

 "[A]s a general rule the question of attorneys' fees is a factual matter which lies within the 'sound discretion of the trial judge' and will not be overturned unless clearly erroneous." *Maxima Corp. v. 6933 Arlington Develop. Ltd. P'ship*, 100 Md.App. 441, 452, 641 A.2d 977 (1994) (internal quotation omitted). Maryland follows the American rule of attorneys' fees, which "stands as a barrier to the recovery, as consequential damages, of foreseeable counsel fees incurred in

---

**16.** Long also contends that the Elphages are precluded from raising the issue of attorneys' fees for litigation expenses from January 2003 to October 2005 because these fees related to litigation expenses incurred in the declaratory judgment action. Stressing that the circuit court refused to impose attorneys' fees in that action, Long contends that the court's decision is a final judgment for purposes of *res judicata*. That contention is legally incorrect.

The doctrine of *res judicata* bars the "same parties from litigating a second lawsuit on the same claim, or any other claim arising from the same transaction or series of transactions and that could have been-but was not-raised in the first suit." *Lizzi v. Wash. Met. Area Transit Auth.*, 384 Md. 199, 206, 862 A.2d 1017 (2004) (internal quotations and alteration omitted). Accordingly, if a judicial body has issued a final judgment on the merits of a claim, *res judicata* prevents a subsequent tribunal from deciding that issue or any other issue that could have been raised in the prior proceeding. *North American Specialty Insurance Company v. Boston Medical Group*, 170 Md.App. 128, 137, 906 A.2d 1042 (2006). If, however, on appeal, the appeal based on the circuit court's judgment is dismissed as moot, the decision of the circuit court no longer has preclusive effect. *Campbell v. Lake Hallowell Homeowners Ass'n.*, 157 Md.App. 504, 526, 852 A.2d 1029 (2004). That is precisely what occurred in the case *sub judice*. In *Long I*, we declined to address the Elphages' cross-appeal on attorneys' fees because our decision to vacate the trial court's declaratory judgment "rendered the Elphages' cross-appeal moot." *Long I*, slip. op. at 13. Accordingly, because the 2005 order of the circuit court with respect to attorneys' fees was not a final judgment, the Elphages were not barred by *res judicata* from requesting attorneys' fees for litigation expenses incurred in that action in the foreclosure proceeding.

enforcing remedies for' breach of contract." *B & P Enter. v. Overland Equip. Co.*, 133 Md.App. 583, 620–21, 758 A.2d 1026 (2000) (internal quotation omitted). When attorneys' fees are based on a contractual right, the paying party is entitled to have the amount of fees and expenses proven by competent evidence and with the certainty ordinarily applicable for proof of contractual damages. *Maxima*, 100 Md.App. at 452–53, 641 A.2d 977. The burden of proof lies upon the party seeking fees. *Id.* at 453–54, 641 A.2d 977. The sufficiency of the evidence presented as to attorneys' fees must be more than simply the number of hours worked, but less than a line by line analysis of services rendered. In *Maxima*, 100 Md.App. at 453–54, 641 A.2d 977, we articulated, in relevant part, "the detail required and the quantum of information that the prevailing party must provide" to meet his or her burden:

A fee is not justified by a mere compilation of hours multiplied by fixed hourly rates or bills issued to the client; [ ] *a request for fees must specify the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged;* [ ] it is incumbent upon the party seeking recovery to present detailed records that contain the relevant facts and computations undergirding the computation of charges; [ ] without such records, the reasonableness, *vel non*, of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence.

(Emphasis in original).

Once presented with these facts, however, the trial court still must evaluate the reasonableness of the fee request. *Id.* at 454, 641 A.2d 977. In *Maxima*, we also explained that the trial court's analysis must take into consideration the criteria set forth in Maryland Rule of Professional Conduct 1.5:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

100 Md.App. at 454–55, 641 A.2d 977 (quoting Md. Rule 1.5).

■■■ As an initial matter,[17] we conclude that the Elphages failed to meet their burden of production as to "the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged" *Maxima,* 100 Md.App. at 453–54, 641 A.2d 977, for attorneys' fees for January 2003 through December 2004. In their motion and at trial, the Elphages offered into evidence three exhibits detailing the amount of time counsel had spent on enforcing the contract:

---

**17.** In their motion, the Elphages asked for attorneys' fees for two time periods: "January 2003 through October 2005," for the declaratory judgment and breach of contract action and "January 2007 through the present," for the foreclosure surplus proceedings. In their original motion filed in April 2007, the Elphages' log of Professional Services included hours spent in connection with the supersedeas bond and discussing settlement which took place in March 2006. The log of Professional Services they submitted at trial however, did not include that time. Also, the list of expenses submitted included expenses incurred in 2006. However, the Elphages did not request fees for that time period. At the hearing Niedermayer testified that the hours and expenses the Elphages submitted "from the date of January 2003 through October **2005** represents the period from the initial suit through the conclusion of the appeal." The appeal, however, was concluded in October **2006,** when we issued *Long I.* It is not clear whether the discrepancies are "slips of the tongue" or substantive inconsistencies. As we are remanding the issue of attorneys' fees to the circuit court, it is not necessary for us to resolve this question.

(1) Affidavit of Roy I. Niedermayer in Support of Award of Attorneys' Fees; (2) hourly log of "Professional Services" from January 6, 2005 through April 5, 2007, listing the service performed, the attorney performing the service, the time spent, and the date the service occurred; and (3) summary chart of Professional Services for both of those time periods. Additionally, Niedermayer testified at trial as to the expenses incurred in enforcing the contract and the court heard testimony of an·expert "in the field of law and legal rates and services provided in the Maryland suburban area." Regarding the time spent on enforcing the contract from January 2003 through December 2004, Niedermayer's affidavit stated:

· From January 2003 through December 2004, while I was a sole practitioner, I expended a total of 20.2 hours of legal time performing legal services for the Elphages to enforce the terms of the ... [c]ontract entered into between them and Arthur Long. Such legal services were necessary to represent the Elphages and litigate this matter.

From January 2003 through October 2005, my associate, Katharine O. Porwick and I expended a total of 126.9 hours of legal time performing legal services for the Elphages to enforce the terms of the contract.

Similarly, the summary sheet offered in evidence by the Elphages merely stated that Niedermayer and Porwick spent 126.9 hours enforcing the Contract "From January 2003 through October 2005" and listed their hourly rates of $275.00 per hour (Niedermayer) and $180.00 per hour (Porwick). At trial Niedermayer reiterated the contents of his affidavit, testifying that he had expended "approximately 20" hours on the Elphages' case as a solo practitioner. We do not agree with the Elphages' contention that this evidence met their burden of production.

Our opinion in *B & P Enterprises* is instructive. There, the appellee, a commercial lessee brought suit against the appellant, a lessor, alleging breaches of lease in connection with relocation of vehicle storage lot. 133 Md.App. at 599, 758 A.2d 1026. The circuit court found in favor of the appellee, and the

court awarded attorneys' fees, pursuant to a provision in the lease. *Id.* at 620, 758 A.2d 1026. Before the circuit court, the appellee "offered a bill for services of trial counsel" which "simply listed the attorneys' total number of hours." The appellee did not offer proof as to the type of services rendered or to the necessity of those services in the litigation. *Id.* Upon review of the record before the trial court, we vacated and remanded the court's decision because the appellee "failed to present sufficient evidence to satisfy the factors articulated in *Maxima* or those derived from the Model Rules of Professional Conduct." *Id.* at 627, 758 A.2d 1026. We reasoned that a mere "compilation of hours multiplied by fixed hourly rates" would not satisfy the burden of production articulated in *Maxima. Id.* at 630, 758 A.2d 1026.

The same shortcoming exists in the evidence of billings from January 2003 through December 2004 in the case *sub judice.* Like the appellee in *B & P Enterprises*, the Elphages merely presented a "compilation of hours multiplied by fixed hourly rates," *see id.*, noting that Niedermayer had spent approximately 20 hours on their case during that time. *See id.* This was clearly "in contravention of the principles espoused in *Maxima " Id.* Accordingly we conclude that the Elphages did not meet their burden of production on the issue of attorneys' fees accrued from January 2003 to December 2004.

Next, we note that in analyzing the evidence before it, the trial court did not apply the reasonableness factors articulated in Rule 1.5 that we espoused in *Maxima.* In reaching its conclusion, the trial court focused only on "the amount of work that was put into this case" as detailed in the testimony, as well as the Elphages' billing records and our opinion in *Long I.* Among the factors set out in Maryland Rule of Professional Conduct 1.5 that the trial court failed to consider were:

(1) the time and labor *required,* the novelty and difficulty of the questions involved, and the skill *requisite* to perform the legal services properly; and

(4) the amount involved and the *results* obtained.

(Emphasis added) See *Maxima* 100 Md.App. at 454–55, 641 A.2d 977.

Appellees sought to enforce their contractual rights by pursuing a declaratory judgement action, a method that was wholly ineffective to accomplish their primary goal. As we described in *Long I*, the only available process to enforce a land installment contract is through a foreclosure, which appellees never pursued. The only portion of the declaratory judgment action that reached a substantive conclusion was decided in favor of Long.[18] In addition, the two prior appeals to this Court were decided unfavorably to the Elphages. The trial court should have taken into consideration that a significant portion of the Elphages' attorney's fees were accumulated in connection with this unsuccessful litigation.

Accordingly, we shall vacate the trial court's award as to attorneys' fees and remand for that court to apply the appropriate standards and determine what, if any, attorney's fees the Elphages may be entitled to recover.[19]

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**APPELLEES TO PAY COSTS.**

---

18. The assignment to Long was held to be valid.

19. Long has filed a motion to supplement the record and record extract by addition of an order respecting fees issued on July 3, 2008, in the declaratory judgment action. Given our disposition of the issues in this appeal, we decline to supplement the record and therefore deny Long's motion.